RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.:  8:09-CV-02221-JSM-MAP

PLACIDA PROFESSIONAL CENTER, LLC,      )
a Florida Limited Liability            )
Company, MICHAEL B. EDWARDS and        )
SHERYL A. EDWARDS,                     )
                                       )
              Plaintiffs,              )
                                       )
vs.                                    )
                                       )
FEDERAL DEPOSIT INSURANCE              )
CORPORATION, as Receiver for           )
FREEDOM BANK,                          )
                                       )
              Defendant.               )
                                       )
_____ )


                    DEPOSITION OF
         RICHARD W. BASS, MAI, AICP, EAC


        TAKEN BY:    ATTORNEY FOR DEFENDANT

     DATE TAKEN:    March 25, 2011

          TIME:    10:10 a.m. - 12:45 p.m.

         PLACE:    2014 Fourth Street
                   Sarasota, Florida

       BEFORE:    Patricia A. Pilarski, CSR

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 2

```
 1        APPEARANCES:
          MICHAEL H. ROSEN, ESQ.
 2        Saxon, Gilmore, Carraway & Gibbons, P.A.
          201 East Kennedy Boulevard, Suite 600
 3        Tampa, Florida 33602
          (813) 314-4500
 4
                    Attorney for the Plaintiffs
 5
          SHERYL A. EDWARDS, ESQ.
 6        The Edwards Law Firm, PL
          1901 Morrill Street
 7        Sarasota, Florida 34236
          (941) 363-0110
 8
                    Attorney for the Defendants
 9
          ALSO PRESENT:
10        Michael B. Edwards

11

12                      I N D E X

13                                              PAGE

14        Direct Examination by Mr. Rosen          3

15        Certificate of Oath                     85

16        Certificate of Court Reporter           86

17

18                    E X H I B I T S

19        DESIGNATION           DESCRIPTION       PAGE

20           A         A Special Purpose Retrospective   31
                       Appraisal Assignment
21

22

23

24

25
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 3

1       THEREUPON,

2                   RICHARD W. BASS, MAI, AICP, EAC

3       was adduced as the witness herein, and being first duly

4       sworn upon oath, was questioned and testified as

5       follows:

6                   THE WITNESS:  Yes, I do.

7                        DIRECT EXAMINATION

8       BY MR. ROSEN:

9            Q.    Good morning, Mr. Bass.  My name is Michael

10      Rosen.  I represent the FDIC as receiver for Freedom

11      Bank in this case.  I am here to take your deposition.

12                 If you don't understand my question, please

13      let me know and I will be glad to repeat it for you.

14      If you need to take a break, just let me know and we'll

15      try to accommodate you.

16           A.    Okay.

17           Q.    Do you have any questions before we get

18      started?

19           A.    No.  If you ask a question, I don't

20      understand it, if you rephrase it, if you use terms I

21      don't understand, explain the terms.

22           Q.    Absolutely.

23           A.    Thank you.

24           Q.    State your full name for the record, please.

25           A.    Richard William Bass.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 4

1           Q.    And your business address?

2           A.    1953 8th Street, Sarasota, Florida.

3           Q.    Your occupation?

4           A.    Real estate appraiser.

5           Q.    How long have you been a real estate

6     appraiser?

7           A.    28 years.

8           Q.    Did you receive a document, amended notice

9     of taking duces tecum?

10          A.    Yes, sir.

11          Q.    Okay.  Did you bring your entire work file

12    with you here today?

13          A.    Yes.

14          Q.    Okay.  I would like to review your file at

15    the end of the deposition and ask you some questions

16    and probably would like to make some copies.  How would

17    you like to do that as far as if we need copies?  Do

18    you want to bring it to a third-party copy service?  Do

19    you want to make the copies?

20          A.    I will make the copies.  You tag it, I will

21    make it.

22          Q.    We'll pay you for the costs associated with

23    that.

24          A.    Okay.

25          Q.    Have you taken anything out of your work

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 5

1       file?

2               A.      No.

3               Q.      So you brought your entire work file?

4               A.      Entire work file.

5               Q.      You didn't remove any papers or anything

6       like that prior to today's deposition?

7               A.      I may have thrown some scrap paper away that

8       wasn't relevant to any analysis or determination.  I

9       have several pages where on the back side they are

10      copies of other things I have X'd out; but, no.

11              Q.      What is the name of your business?

12              A.      Bass & Associates, Inc.

13              Q.      And you have a satellite office now?

14              A.      Yes.

15              Q.      Have you always had that?

16              A.      In Venice.  I have had that for about eight

17      years.

18              Q.      How many real estate appraisers do you have

19      working with you?

20              A.      Five.

21              Q.      Are you the principal of your company?

22              A.      Yes.

23              Q.      And what are the -- how many -- how many

24      appraisers work at your Venice office?

25              A.      Just one.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                         d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 6

1        Q.    Who is that?

2        A.    Tracy Hiney, H-i-n-e-y.

3        Q.    Okay.  And so the three or four other

4   appraisers work with you?

5        A.    Yes.

6        Q.    Okay.  What are the names of those

7   individuals?

8        A.    Robert Fletcher, Susan Fletcher.

9        Q.    What is the relationship of --

10       A.    Brother and sister.

11       Q.    Okay.

12       A.    Steven Garcia, Brenda Bailey.

13       Q.    And what are their -- Mr. Fletcher is an

14  MAI?

15       A.    Mr. Fletcher is an MAI, AICP, CPIM.

16       Q.    And what about Susan Fletcher?

17       A.    She is a state certified general appraiser.

18       Q.    And what about Mr. Garcia?

19       A.    A state certified residential appraiser.

20       Q.    And Brenda --

21       A.    State certified residential appraiser.

22       Q.    Okay.  And who worked on this assignment in

23  addition to yourself?

24       A.    Robert Fletcher.

25       Q.    Nobody else?  None of the other appraisers?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 7

1        A.    Correct.

2        Q.    And if you -- in terms of percentage of the

3   work, what percentage of the work did you do?

4        A.    50/50 I would say.

5        Q.    Who did the verification of the sales?

6        A.    The accommodation of Mr. Fletcher and

7   myself.

8        Q.    Can you tell me what tasks you did for the

9   appraisal?

10        A.    Basically sat down with the scope of work,

11   identified or defined the types of the variable

12   properties we would need, did some additional research.

13   But primarily Mr. Fletcher did the research on the

14   comparables; reviewed our existing files, since this is

15   a retrospective appraisal to see what appraisal we

16   already had in-house we could utilize, extracted those;

17   analyzed the -- put them in a sales grid and analyzed

18   the sales; determined which, if any, needed to be

19   adjusted for which feature.  I concluded the opinions

20   of value.

21        Q.    I noticed that Mr. Fletcher did not sign the

22   appraisal report.  It's just signed by yourself,

23   correct?

24        A.    Correct.

25        Q.    Would he have been able to sign the

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 8

1      appraisal report based on the work that he did?

2          A.    No, because he didn't ultimately render the

3      opinion of value, but he did do substantial work by

4      confirming additional comparables.

5          Q.    Okay.  I am going to ask you some other

6      questions about that.  But before I do, I want to go

7      into some background information.  Tell me what kind of

8      appraisal work your firm currently offers, appraisal

9      services.

10         A.    We offer a very wide variety of services

11     from providing traditional bank appraisals, we do title

12     policy cases, we do and offer market studies and

13     feasibility studies, even though we haven't done those

14     in quite awhile.  We get involved in rezoning

15     variances.  We do divorce appraisals, we do estate

16     appraisals, we do imminent domain appraisals.

17         Q.    Okay.  And of those services are you

18     involved in doing all of that type of work?

19         A.    Predominantly, approximately, 95 percent

20     that goes out of our office I have reviewed and signed

21     off on.

22         Q.    Can you give me a breakdown as to the types

23     of work that you mentioned, you know, with the first --

24     as far as the different types of appraisal services.

25     For example, do you do more title policy work than

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 9

1       imminent domain work or what is the pecking order?

2           A.    Well, the pecking order, imminent domain is

3       at the bottom of the list.  There is not a lot of

4       imminent domain work out there.

5           Q.    I understand.

6           A.    We have existing imminent domain projects

7       that we've completed and we'll certainly be involved in

8       some additional work on those projects.  I think we

9       have 60 parcels.

10          Q.    Where is that?

11          A.    It's in Charlotte County.  We'll probably

12      have maybe five or eight of those maybe actually go

13      further beyond mediation.

14          Q.    Is that a bid process?

15          A.    No.  We've already done the imminent domain

16      assignment.

17          Q.    I am talking about as far as getting the

18      work, did you bid on it?

19          A.    Yes.  So that would be the bottom end of our

20      scale right now.  A lot of our existing work --

21      currently our existing work, we are currently starting

22      to get new bank assignments for actual sales.  We do a

23      lot of, again, estate work.

24          Q.    Let me just go back for a second.  As far as

25      the bank work, what banks does your firm do work for?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

```
 1         A.    We've lost about eight of them because

 2    they've closed.  Currently, Premiere American Bank.

 3    They go under several names right now.  They have First

 4    Community Bank, it's Peninsula Bank.  They are all part

 5    of the Premiere American umbrella right now.

 6         Q.    Where are they based out of?

 7         A.    I think Premiere American Bank is based out

 8    of Miami, but First American Bank -- First Community

 9    Bank is based out of Lee County.  Peninsula Bank is

10    based out of Sarasota County.  We do work for Synovus

11    Bank, TIB Bank, M&I Bank, for State Bank, a number of

12    banks.

13         Q.    And is this -- the bank work that you do, is

14    that in cases that the bank has taken back either

15    residential or commercial properties and they are

16    asking you to formulate an opinion as to the current

17    value of the property?

18         A.    Well, we do both.  One is called the

19    revaluation of a portfolio.  So we've had a number of

20    those assignments.  We'll get 10, 12 properties we will

21    appraise for them.  Again, currently the newest

22    assignments are for refinancing, continuation of

23    existing loans, and/or new acquisitions.

24         Q.    Is that hourly based work, or is there

25    some --
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 11

1          A.     No.  That is a fee based work.

2          Q.     So, it's a fee based.  So do you quote a fee

3      for it?

4          A.     Yeah.  It's a bid process.

5          Q.     So you are on the approved appraiser list?

6          A.     Yes.

7          Q.     Do they call you up and say, hey, Rick, I

8      have got 10 properties?  This is roughly what they are.

9      Can you give me --

10         A.     A bid.  A bid and time.  We also do work for

11     Regions Bank; FirstServices PGP, which is basically an

12     entity set up to provide services for FDIC.  Their

13     client is FDIC.

14         Q.     Whose client is?

15         A.     FirstServices PGP Valuation.  All of their

16     work is done for FDIC.

17         Q.     FirstServices for --

18         A.     FirstServices PGP Valuation.

19         Q.     Okay.  So in those cases you are employed by

20     that entity and not the FDIC; is that correct?

21         A.     Employed -- they are an appraisal management

22     company, so we are employed by them, paid by the FDIC,

23     report certified to them and certified to the FDIC.

24         Q.     Okay.  How long have you been doing that

25     kind of work?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 12

1          A.    A couple years, I guess.

2          Q.    And how many assignments roughly have you

3     had, say, within the last year?

4          A.    10, 12.

5          Q.    What kind of assignments?

6          A.    All kinds.  It varies from vacant land to

7     improvement land to commercial properties to office

8     warehouse property.

9          Q.    Is that hourly work or do you quote a fee on

10    that as well?

11         A.    That's a fee.

12         Q.    Do you have current cases that you are

13    working on involving that entity?

14         A.    Yes.  We've got one appraisal right now from

15    them.

16         Q.    So you just quote them a fee?  You don't

17    quote them -- do you also give them an hourly rate that

18    is associated with that, or do you just say it will be

19    five grand, for example, to a --

20         A.    Based on what they are asking for is a flat

21    fee for the appraisal.

22         Q.    Okay.

23         A.    If there is --

24         Q.    So they don't care?

25         A.    If there are post report services needed,

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 13

1      that is a separate contract.

2           Q.    Have you ever testified in any of those

3      cases?

4           A.    No.

5           Q.    What would you say -- who would you say --

6      or what currently is your biggest client?  Is it bank

7      work or is it attorneys or something else?

8           A.    Right now I would say 50/50 bank work and

9      litigation work, attorneys.

10          Q.    You were talking about market studies.  You

11     said you have done market studies in the past.  But you

12     have currently kind of transitioned out of that or

13     because of the economic climate you are not doing it

14     or --

15          A.    Economic climate.

16          Q.    The appraisers that work for you, are they

17     working on a full-time basis or are they working on a

18     contract basis?  How does that work?

19          A.    Technically they are independent

20     contractors.  They each have their own either LLC or

21     other entity.  They predominantly work for me.  They

22     are certainly allowed to take an assignment from

23     someplace else.  Mr. Fletcher certainly takes

24     assignments for himself and his own company, especially

25     if I have a conflict.  I also serve as a special

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 14

1        hearing magistrate to the Value Adjustment Board in

2        Sarasota County.  So I can't take on any Avalon tax

3        cases that would go before a special magistrate.  So

4        Mr. Fletcher does those under his Fletcher Appraisal

5        Services, Inc.

6             Q.    And then how long has he worked with you as

7        an independent contractor?

8             A.    Eight years, nine years.

9             Q.    When did he receive his MAI?

10            A.    I think three years ago.

11            Q.    Okay.  Was he a planner?  Did he work for

12       Marianne Bouie (phonetic) before?

13            A.    Yes.  And he worked for Eric Ward and

14       Durance.  He worked for Durance for awhile.

15            Q.    Where did you go to college?

16            A.    Florida International University, Miami.

17            Q.    Do you -- what was your major?

18            A.    Urban planning, environmental management.

19            Q.    Did you have any post bachelor's education?

20            A.    No college.  No additional college

21       education.  Just technical trade education.

22            Q.    What licenses or certifications do you hold?

23            A.    I am licensed as a certified general real

24       estate appraiser, licensed real estate broker, licensed

25       appraisal instructor by the State of Florida,

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 15

1       Department of Business and Professional.

2              Q.    And appraisal designations?

3              A.    MAI.

4              Q.    How long have you had that?

5              A.    '96.

6              Q.    Do you --

7              A.    I am not done.  Appraisal designations, MSA,

8       master senior appraiser; BCBA, board certified business

9       appraiser.  I have retired from that.  I used to be a

10      CRA, certified review appraiser.  I gave that up.

11             Q.    With the MAI have you ever served as an

12      officer or director in that organization?

13             A.    No.

14             Q.    Have you ever written any articles for the

15      appraisal institute?

16             A.    No.

17             Q.    Have you ever been disciplined by the

18      appraisal institute?

19             A.    No.

20             Q.    Has there ever been a finding of probable

21      cause by the Florida Real Estate Appraisal Board?

22             A.    No.

23             Q.    Have you qualified as an expert witness

24      before in Federal Court?

25             A.    Yes.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 16

1          Q.    On how many occasions?

2          A.    Three, I believe.

3          Q.    And have you qualified in the Middle

4     District before?

5          A.    In Tampa?

6          Q.    Yes.

7          A.    Yes.

8          Q.    And the other two, were those also in the

9     Middle District?

10         A.    Yes.

11         Q.    Do you recall which judge you were in front

12    of?

13         A.    Two different judges.  One was a female

14    judge.

15         Q.    Kovachevich?

16         A.    Possibly.  I am really bad with names.

17         Q.    Tell me about your testimony in these three

18    -- on these three instances.

19         A.    One was a bankruptcy -- two of them were

20    bankruptcies.  I can't remember what the first one was.

21         Q.    Okay.  And when were the bankruptcy cases?

22         A.    One was this year.  One was two years ago,

23    and the other case was, probably, five years ago.

24         Q.    And the case that you testified in this

25    year, how long did you testify for?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 17

1          A.     Fifteen minutes.

2          Q.     Were you cross examined?

3          A.     No.  The other case was -- I am sorry.  I

4     just remembered what it was.  Dr. Klauber's spa project

5     on Longboat Key.

6          Q.     How do you spell his name?

7          A.     K-l-a-u-b-e-r.  Versus the Town of Longboat

8     Key.

9          Q.     That was not a bankruptcy case?

10         A.     That was not a bankruptcy case.

11         Q.     And what was your role in that case?

12         A.     I provided planning and expert appraisal

13    testimony relative to the value of the property.

14         Q.     Okay.  And how long was your testimony --

15    that was the most recent or the --

16         A.     The most recent.

17         Q.     And, approximately, how many years are we

18    talking about?

19         A.     That could be 10 years.

20         Q.     Okay.  What do you recall about that?

21         A.     I stood on the stand for about four hours.

22    Yeah.

23         Q.     So you were cross examined in that case?

24         A.     Yes.  Okay, and there was another case.  I

25    just remembered another case, which was Elling, middle

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 18

1        initial O, last name Eidd, versus Sarasota County.

2            Q.    And when was that time wise into the spa

3        case?

4            A.    Probably in the '90s. Before the spa case.

5            Q.    Do you recall the -- any of the

6        cross-examination in either one of those two cases?

7            A.    Again, related to planning and zoning issues

8        and valuation.

9            Q.    Have you been -- when you testified in the

10       Federal Court cases you were qualified as a real estate

11       appraiser in the area of real estate appraising?

12           A.    With respect to the Elling case and the

13       Longboat Key case, I think I qualified as both,

14       appraiser and planner.

15           Q.    But you are not sure?

16           A.    That is my recollection.  But am I not sure?

17       Correct, I am not sure.  But that is my recollection.

18           Q.    Have you ever failed to qualify as an expert

19       witness?

20           A.    No.

21           Q.    You list yourself or your firm as an

22       economist.

23           A.    Yes.

24           Q.    Are you an economist?

25           A.    Every appraiser is an economist.  The first

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 19

1        two chapters of the appraisal is economics.

2              Q.    As it relates to this case do you see

3        yourself testifying as an expert as an economist?

4              A.    No.

5              Q.    What about in planning?

6              A.    No.

7              Q.    So we are just talking about real estate

8        appraising?

9              A.    Valuation.

10             Q.    Going back to Mr. Fletcher for a second, so

11       percentage wise what percentage would you say that he

12       does work for you that comprises his total workload?  I

13       mean, is he working 90 percent for you and 10 percent

14       --

15             A.    98 percent for me.

16             Q.    Okay.  And how long has that been the case?

17       Since he started work?

18             A.    Since he got his MAI.

19             Q.    So we are going back, what, three years

20       approximately?

21             A.    Yeah.  Prior to that it was 100 percent for

22       me.

23             Q.    Did you -- when he went for his MAI were you

24       involved in the certification process as far as signing

25       off on any of his reports or --

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 20

1          A.    Yes.

2          Q.    So as far as the appraisal work tasks that

3    Mr. Fletcher did versus your work, you said that he was

4    involved in picking out the initial comps, is that --

5          A.    We discussed the types of properties to

6    research.  I did some research primarily looking at our

7    existing file to see what information we already had.

8    Mr. Fletcher did research for new information, new

9    comparables.  Found those, reviewed those, verified

10   those, photographed those.

11         Q.    Have you offered -- authored any appraisal

12   materials that you believe are relevant to this case

13   specifically?

14         A.    No.

15         Q.    What would you say is the geographical

16   location that you do your appraisal work in?  Do you

17   concentrate that -- you are based in Sarasota.  I would

18   assume that most of your work is in Sarasota.  Is that

19   -- would that be accurate?

20         A.    Our primary market area is Manatee,

21   Sarasota, Charlotte and then Lee.

22         Q.    Would it be in that order?

23         A.    No.

24         Q.    What order would it be in?

25         A.    I would say predominantly Manatee, Sarasota,

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 21

1          then Charlotte and then Lee, and then other areas.

2               Q.    I thought I asked you the question whether

3          that was -- whether that was the pecking order of the

4          work that you did.  I thought you said no, and then --

5          let me just ask it this way.

6               A.    Okay.

7               Q.    So Manatee, your firm -- or let me just talk

8          about you.  Do you do most of your work in Manatee than

9          any other county.  Is that accurate or not?

10              A.    I do most of my work sitting at my desk

11         reviewing appraisals for my staff appraisers.

12              Q.    I understand that.  But as far as where the

13         properties that you are appraising are located, are

14         they located in Manatee County or are they located in

15         Sarasota County?

16              A.    I have never analyzed mathematically or

17         statistically which counties we have the most

18         assignments in; but again, our primary market area

19         where most of our work comes from is Manatee, Sarasota

20         and Charlotte, and then Lee County and then other

21         counties.

22              Q.    Okay.  Have you done any appraisal work in

23         Collier County?

24              A.    Yes.

25              Q.    Do you have any current assignments for work

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 22

1        in Collier County?

2              A.    Yes.

3              Q.    What kind of work?

4              A.    Title policy cases.

5              Q.    What about Hillsborough County, do you have

6        any current assignments in Hillsborough County?

7              A.    Hillsborough, no.  Terre Verde, is that

8        Hillsborough or St. Pete?

9                    MS. EDWARDS:  Pinellas, I think.

10       BY MR. ROSEN:

11             Q.    When is the last time you appraised property

12       in Hillsborough County?

13             A.    This year.

14             Q.    And how many assignments?

15             A.    Maybe two.

16             Q.    And what kind of assignments are those?  Is

17       that title work as well?

18             A.    Bank assignments.

19             Q.    The revaluations?

20             A.    Yes.

21             Q.    What about Hendry County, do you have any

22       current assignments or present work in Hendry County?

23             A.    No.

24             Q.    When is the last time you have apprised work

25       in Hendry County?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 23

```
 1          A.    It's been awhile.  I can't remember the last
 2     time.
 3          Q.    How many assignments would you say that you
 4     had in Hillsborough County over the last three years?
 5          A.    It would just be a guess.  I would say half
 6     a dozen -- half a dozen.
 7          Q.    Okay.  Let's talk about your work in
 8     Charlotte County.  Have you appraised other properties
 9     similar to the subject in Charlotte County before?
10          A.    Define similar for me.
11          Q.    Well, why don't you define it for me.  As
12     far as you appraised the subject property, have you
13     appraised properties like the subject before?
14          A.    Okay.  We started off at the beginning of
15     this deposition, if you use the term, you explain it to
16     me.  And I want to know what you mean by similar.  That
17     is all I am asking.
18          Q.    Okay.  Well, office uses.
19          A.    Yes.
20          Q.    Okay.  Multi-tenant office use.
21          A.    Yes.
22          Q.    Do you have any current assignments in
23     Charlotte County --
24          A.    Yes.
25          Q.    -- for office appraisals?
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 24

1           A.     Yes.

2           Q.     Okay.  Approximately how many?

3           A.     I got this one.

4           Q.     In addition to this one.

5           A.     Right now Charlotte, no, not office.

6           Q.     When is the -- when do you recall the last

7     time you appraised an office building in Charlotte

8     County?

9           A.     I am sure it was, probably, if not this

10    year, within the previous six months.

11          Q.     Okay.  Are you able to be more specific than

12    that?

13          A.     No, sir.

14          Q.     And would the same hold true for your firm

15    as opposed -- because the question is directed to you.

16    Would the same hold true -- your answer hold true for

17    your firm?

18          A.     I am answering for my firm because

19    everything goes through me.

20          Q.     That is what I needed to know.

21          A.     Again, 98 percent of everything is reviewed

22    by me, whether I sign off on it or not.  But 98 percent

23    of everything is signed off by me.  To give you a

24    background, when Bailey was certified as a residential

25    appraiser, if the entity that hires us doesn't require

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 25

1       my signature because she is certified, she signs it.  I

2       review it, but I don't sign off on it.  Mr. Fletcher

3       has assignments that doesn't require my signature;

4       therefore, I review it but I don't sign off on it.  I

5       review it solely because it's my name and letterhead

6       and I want to make sure our i's are dotted, our t's

7       are crossed.

8           Q.    Okay.  Let's get back to the -- your prior

9       appraisal assignments for office.  Do you recall the

10      last time you appraised an office building in Charlotte

11      County?

12          A.    The date?

13          Q.    Yes, the date.

14          A.    No.  Again, it would, probably, be the last

15      six months.

16          Q.    And what about prior to that, do you have

17      any recollection as to the number of office -- let me

18      ask you this.  How many appraisal reports have you

19      completed for office properties within the last three

20      years in Charlotte County?

21          A.    Again, it would be a guess on my part.  A

22      dozen or more.

23          Q.    What about Hillsborough County, the same

24      question, last three years how many office appraisals

25      have you done in Hillsborough County?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                        d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 26

1          A.    I don't believe we have done any office

2    buildings in Hillsborough County.  I don't recall any

3    at all.

4          Q.    What -- what about Hendry County?

5          A.    Hendry?

6          Q.    Yes.

7          A.    No, sir.

8          Q.    What about Collier County?

9          A.    It would be like an individual office

10   condominium type property; not a complete development.

11         Q.    Are you aware of any other appraisal reports

12   that were completed with regards to the subject

13   property?

14         A.    Yes.

15         Q.    Okay.  What?

16         A.    One prepared by an appraiser by the name of

17   Jim Piro.

18         Q.    How do you spell his last name?

19         A.    P-i-r-o.

20         Q.    Was that the bank appraisal?

21         A.    Yes.

22         Q.    What was the value of that?

23         A.    We had two opinions of value in that report.

24   One was land value opinion, and one was asset completed

25   value opinion.  I think it was 4 million, 1 for the

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 27

1      completed.  I have a copy of it here.  The land value

2      was a million.

3            Q.    Can you pull that out, please?

4            A.    I can.  Land value opinion of $1,210,000.

5            Q.    What is the date of value?

6            A.    February 12, 2007, for the land value.

7            Q.    I am sorry.  The land value again?

8            A.    1,210,000 as of February 12, 2007.

9            Q.    Okay.

10           A.    And then as a completed value with the

11     perspective value as of March 2008 of $4,100,000.

12           Q.    And do you know Mr. Piro?

13           A.    Yes, I do.

14           Q.    How do you know him?

15           A.    I met Mr. Piro in 1985.  He and I worked for

16     the same MAI appraiser, Roger Tegnacamp (phonetic).

17     And then Jim and I shared office space from -- the end

18     of '85, '86, '87.

19           Q.    Is that Ron Tegnacamp's father?

20           A.    Yes.

21           Q.    What kind of business did Mr. Tegnacamp do?

22           A.    Real estate appraisal firm.

23           Q.    In Tampa?

24           A.    Sarasota.

25           Q.    Okay.  Did you talk with him regarding his

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 28

1          appraisal report?

2                 A.    I don't believe so.

3                 Q.    What about anybody else in -- Mr. Fletcher,

4          would you know whether he had spoken with him or not?

5                 A.    I don't believe so.

6                 Q.    Okay.  So did you review his appraisal

7          report as part of the documents that were provided to

8          you prior to completing your appraisal?

9                 A.    I read his report.  I wouldn't use the term

10         review.  Review has a very specific name.

11                Q.    I understand.  What about his -- did you

12         review his sales in the report, in his appraisal

13         report?

14                A.    I looked at the sales.

15                Q.    Okay.  Did you use any of the sales that

16         were used in his report in your report?

17                A.    No.

18                Q.    Why not?

19                A.    Too old.

20                Q.    What were the sales that were -- your date

21         of the value was what?

22                A.    October of 2008.

23                Q.    Okay.  Can you give me the specific date?

24                A.    October 31, 2008.

25                Q.    What is the significance of that date; do

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 29

1     you know?

2          A.    I believe that's the date the receiver was

3     appointed.

4          Q.    Do you know when the loan was repudiated in

5     this case?

6          A.    I think I was advised it was repudiated

7     shortly after that, very shortly after that.  I think

8     it is in the complaint.  I look at that date, but my

9     date of value was October 31, 2008.

10         Q.    Were you given any legal instructions in

11    this case?

12         A.    The value of the property as of October 31,

13    2008.

14         Q.    Other than that?

15         A.    I was given some cases to look at in order

16    to frame my appraisal to be as consistent with the law

17    as an appraiser can understand it to be.

18         Q.    Okay.  Let me ask it this way.  Were you

19    given any written instructions, legal instructions in

20    this case, as it relates to your appraisal report?

21         A.    Other than to look at the case law and frame

22    my report accordingly.

23         Q.    Okay.  Well, let me ask you this: You are

24    not a lawyer, are you?

25         A.    I am not a lawyer.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 30

1          Q.     Okay.  So was the purpose in the cases to

2     give you a generalized understanding or is it something

3     different than that?

4          A.     Well, more of a specific understanding of

5     the methods of valuation that need to be employed based

6     upon, apparently, appellate cases.  How you do a bank

7     appraisal is one way, how you do an imminent domain

8     appraisal is another way, how you do a mold appraisal

9     is another way, how you do these appraisals is a

10    different way.

11         Q.     So if -- I will allow you to answer this

12    question, but first I would like you to answer it yes

13    or no, okay?

14         A.     Okay.

15         Q.     Were you given any written legal

16    instructions as it pertains to this case?

17         A.     I do not believe so.

18         Q.     Okay.

19         A.     So that means no.

20         Q.     Okay.  But you were provided with some case

21    law?

22         A.     Yes.

23         Q.     Okay.  And what was your understanding of

24    the cases that you reviewed as it relates to your

25    appraisal assignment?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 31

1          A.    The method of valuation dealing with actuals

2     and compensatory damages, elements that in my opinion

3     could not include.

4          Q.    What could it not include?

5          A.    Punitive damages, pain and suffering.  One

6     other element.  If I remember -- I don't know.  There

7     are three of them.  I've got it here somewhere.  Pardon

8     me.  I am sharp as a marble today with all of the

9     drugs.

10          Punitive or exemplary damages, damages for

11     lost profits or opportunities, damage for pain and

12     suffering.

13          Q.    Okay.  And what are you reading from?  Is

14     that a specific case or --

15          A.    Well, it's my notes from looking at the

16     cases.  I think I cite which one I used here.

17          Q.    And for the record, what are you looking at?

18          A.    My file, my notes.  I have identified a

19     special purpose legal issues of valuation, which came

20     out of a Parkway Executive Center case vs. FDIC.

21          (Deposition Exhibit A marked for

22     identification.)

23     BY MR. ROSEN:

24          Q.    On page -- let me do this.  I received a

25     copy of your appraisal report with a date of value of

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 32

1       October 31, 2008, file No. 10-280, special purpose

2       retrospective appraisal report, that I have marked as

3       Exhibit A.  At the end of the deposition I would like

4       to attach this to your deposition.  Can you just

5       confirm that this is the document, that is your

6       appraisal report.  I believe it's 83 pages.  Is that in

7       the wrong place?

8              A.    Yes.

9              Q.    Okay.  And the other one may be in the wrong

10      place too.  I noticed that.  But I believe I have all

11      pages of your appraisal report.  I will represent to

12      you that I didn't take any pages out of there.  The

13      only thing is that the two charts, if you will, looked

14      like they are in the wrong place to me.

15             A.    All right.

16             Q.    Does that appear to be your appraisal

17      report?

18             A.    Yes.

19             Q.    Okay.  And it has all 83 pages?

20             A.    Yes.

21             Q.    Okay.  What database did you use for this

22      appraisal assignment?  Do you have -- appraisers

23      usually belong to services where they can plug in

24      sales.  Do you belong to any data services?

25             A.    Several.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 33

1          Q.    Okay.  And what about with respect to this

2     particular assignment?

3          A.    Well, we use all databases we have; Costar,

4     LoopNet, MLS.

5          Q.    Okay.  So like, for example, you -- first

6     you indicated that you had wanted to look and see what

7     data that you had before you went out and looked at

8     other data; is that fair?

9          A.    That's correct.

10         Q.    And what did you find?  As far as what data

11    did you have with regard to office buildings in

12    Charlotte County?

13         A.    Well, both land sales and improved sales.

14    Within the backup file for each of the comparables

15    there would be an existing write-up.  They'll have a

16    different date and file number in the lower left- and

17    right-hand corner, which would indicate this was

18    information we already have in our file.

19         Q.    Okay.  Can you tell me specifically which

20    ones you already had as far as -- let me just back up

21    for a second.  For any of the sales that you had in

22    your appraisal report, had you appraised any of these

23    properties before?

24         A.    For any of the sales?

25         Q.    Yes.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 34

1          A.    I don't believe so.

2          Q.    Have you included any of these sales in

3     prior appraisal reports?

4          A.    Yes.

5          Q.    Okay.  Which ones?

6          A.    I would have to go to the file and tell you.

7     Not that file, but my file will tell you that.

8          Q.    Okay.  Could you do that.

9              MS. EDWARDS:  And when you say are prior

10             reports; other appraisals that his firm has

11             performed on other pieces of property?

12             MR. ROSEN:  Yes.

13    BY MR. ROSEN:

14        Q.    Those would be listed in this report by -- I

15    mean, you can't find out by looking at your appraisal

16    report?

17        A.    No.

18        Q.    You said something about a number there,

19    that there would be --

20        A.    Correct.  As an example, on the land

21    valuation side, comparable number one, in the subject

22    appraisal that you have we had previously verified the

23    sale back in July of '09, and, therefore, I have a

24    different date and file number at the bottom.

25        Q.    Okay.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 35

1          A.    Again, I am doing it -- this is comparable

2     number one, land, in the subject report.

3          Q.    Right.

4          A.    This is the one that we previously had

5     confirmed.

6          Q.    Okay.  And what type of appraisal was that

7     used in?  Do you know the appraisal assignment that

8     relates to that?

9          A.    Market value appraisal.

10          Q.    But as far as specifics, are you able to

11     track that down if you had to?

12          A.    Sure, because I have a file number on it.

13          Q.    Okay.

14          A.    I believe comparable number -- well, I can't

15     tell you that.  Let's go back.  The comparable number

16     four on the subject report from the prior appraisal

17     that was done.

18          Q.    Number four as it relates to -- are you

19     talking about improved property or --

20          A.    We are in the land value.

21          Q.    Still in the land, okay.

22          A.    Number four was through this comparable we

23     had confirmed back in January of '09.  Those are two

24     previous comparable land sales that --

25          Q.    Do you go back after that and -- since you

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 36

1         already had verified that information, do you do it

2         again?

3              A.    No.

4              Q.    Okay.

5              A.    Then relative to improved sales there would

6         be none that were -- they are all new.  No reused

7         sales, if you would.  The rent would be new.

8              Q.    The what?

9              A.    The rents.  Rent comps.

10             Q.    What about the sales dealing with the

11        diminution in value?

12             A.    Those would be new.

13             Q.    So you never had any information regarding

14        those sales prior to conducting your --

15             A.    Investigation of analysis and comp

16        information.

17             Q.    On page 27 of your report --

18             A.    Yes.

19             Q.    -- the last paragraph, the first sentence,

20        the market area is defined as the south Sarasota and

21        western Charlotte County areas, including Englewood,

22        Port Charlotte and Placida areas.  What is the basis

23        for that opinion?

24             A.    Looking at it geographically, that is sort

25        of a pocket market area.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 37

1          Q.    What do you mean by that?

2          A.    Well, you have got the water on one side.

3     From the Placida area you have a large vacant space, if

4     you would, between the Placida area and, say, Merdock,

5     the Englewood market.  And then you go to a large area

6     until you get to south Venice.

7          Q.    Okay.  Why would it not be limited to

8     Charlotte County since the subject property is in

9     Charlotte County?

10          A.    Because the Englewood, Placida area is sort

11     of a geographical homogeneous environment set up almost

12     as a small town.

13          Q.    What do you see as the differences from an

14     economic standpoint -- or from a real estate

15     appraiser's standpoint between Charlotte County and

16     Sarasota?  Isn't Sarasota more urbanized and more

17     affluent than Charlotte County?

18               MS. EDWARDS:  Object to form.

19               THE WITNESS:  Within Sarasota County itself

20          there certainly are some markets; north urban

21          Sarasota County, central Sarasota County and south

22          Sarasota County.  Charlotte County has moved from

23          the city of Punta Gorda as being the core to the

24          Merdock area being the core.  I mean, the

25          courthouse has moved out of downtown Punta Gorda.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 38

```
 1              It's now in Merdock.  All county administration is
 2              in Merdock.  Income levels, probably income levels
 3              in Sarasota County countywide are higher than
 4              Charlotte County.  But comparatively speaking, if
 5              we are looking at like kind properties, whether we
 6              are dealing with an auto convenience fuel center,
 7              we are dealing with this type of office property,
 8              not looking in downtown Sarasota, they are fairly
 9              consistent.
10     BY MR. ROSEN:
11              Q.    Going back to your initial investigation for
12     the appraisal assignments, you indicated that you first
13     went through your existing sales.  I think we
14     established that you used two of the land sales, you
15     had to verify those prior to this particular
16     assignment, but the other sales were new sales; is that
17     correct?
18              A.    Yes.
19              Q.    And in your discussions, what discussions
20     did you have with Mr. Fletcher in directing him to
21     research sales?  Did he do that part of that?
22              A.    He did research sales, yes.
23              Q.    What did you tell him you were looking for?
24              A.    Sales that occurred -- well, first of all,
25     the date of value is October 31, 2008.  We are
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 39

1       conducting a retrospective appraisal; and, therefore,

2       we needed sales that bracketed preferably prior to

3       October 31, 2008, but we can certainly rely upon sales

4       that occurred after that date in order to support any

5       trend analysis.

6           Q.    Okay.  Did you give him specific parameters,

7       Mr. Fletcher?  I mean, did you talk about it as general

8       as you are talking to me about it now, or did you give

9       him specific information?

10          A.    Well, specific information was what is the

11      subject property.  So we had that information.  We

12      looked at the configurations of the property.  We

13      looked at aerial photographs.  We looked at the market

14      materials for it.  We are looking at 2 free-standing

15      buildings and 1 two-story building in the back.  We are

16      looking for like kind properties that we can find

17      within the marketplace.  That was the extent of the

18      parameters.

19          Q.    Let me ask you this: Since he is an MAI and

20      you have worked with him for a number of years, is he

21      doing -- I would assume he has his own opinions as far

22      as what to look for since he does it everyday on his

23      appraisal assignments.  Was it necessary for you to

24      have a -- did you have a discussion with him about this

25      or is it he knows what the appraisal assignment is and

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 40

1          he knows what he should look for?

2                    MS. EDWARDS:   Object to form.

3                    THE WITNESS:   He knows.   However, on each

4               appraisal assignment I give to an associate we

5               always talk about it because I want to make sure

6               we are on the same page about where we are going

7               on a specific assignment.   Now, that associate may

8               come back to me and say, no, we can't get there

9               from here because I can't find this comp or I

10              can't find that comp and what I found was this and

11              we change the direction.   We always have a

12              discussion; here is the new assignment, here is

13              what we are looking for.

14         BY MR. ROSEN:

15              Q.   Do you recall having a discussion with him

16         in this particular case, or do you know that you do it

17         because it happens in every case?

18              A.   I know I do it because it happens in every

19         case.   I can recall sitting down with Bob saying, okay,

20         we got a new assignment.   This is what we are doing.

21         We need to find this kind of comparable.

22              Q.   Okay.   Did you tell him any areas to stay

23         away from?

24              A.   No.

25              Q.   Okay.   So, I mean, certainly he would want

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 41

1       to -- if it's related to the date of value, you want it

2       to be as close to the date of value as possible,

3       correct?

4           A.    Yes.

5           Q.    So when you are providing him that

6       information he already knows that, doesn't he?

7           A.    Yes.

8           Q.    Okay.  So --

9               MS. EDWARDS:  Object to form.

10      BY MR. ROSEN:

11          Q.    What information are you giving him as an

12      MAI appraiser that he doesn't already have?  What

13      specific information?  Or are you just talking in

14      general terms with him?

15          A.    I would have to characterize it as general

16      terms about what the assignment is and what the scope

17      of the assignment is.

18          Q.    Okay.  And how long would you say that you

19      sat down with him?  Are we talking about like a few

20      minutes or --

21          A.    Well, certainly a few minutes.

22          Q.    So then does he come back to you with sales

23      after that?

24          A.    Yes.

25          Q.    And say, let's take a look at these, or tell

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 42

1      me about that process?

2          A.    General -- more and more, the general

3      process is now they come back to me and they go, I

4      can't find any sales.  What do you want me to do?  Do

5      you want me to go further back or what do you want me

6      to do?  There is no sales.  I say, okay.  He brings it

7      back and I think we can work with these and see if we

8      can get them confirmed.

9          Q.    Okay.  So he felt --

10          A.    I always go, that is the best you got?

11          Q.    He felt comfortable with the information

12      that he gave you relative to this particular case?

13          A.    I don't understand the question.

14          Q.    You said that he came back -- my

15      understanding is that he came back with, you said a

16      stack of sales, and then you said something to the

17      effect of let's get these verified.

18          A.    Let's see if we can get these verified.

19      This is what I found.  Here is the search that I have

20      done.  These seem to fall within a range of what would

21      be appropriate for the subject.  Now can we get them

22      verified.

23          Q.    Okay.  And when he does that information,

24      what is the -- does he plug parameters into an MLS

25      service and then it spits out sales?  Is that the way

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 43

1      that it works?

2            MS. EDWARDS:  Object to form.

3            THE WITNESS:  Well, for nonresidential

4      property, MLS is not a good source.  MLS is good

5      for residential properties.  You have to look at

6      CoStar, at LoopNet or Win2Data, and that is where

7      you plug in parameters.

8  BY MR. ROSEN:

9      Q.   Do you know what parameters he plugged in?

10  Does it give you a printout?

11      A.   No.  Because again, you start -- you start

12  with a narrow search.  The way the process works, you

13  start with a narrow search.  I've got a 17,600 square

14  foot office building, okay.  Let me find something that

15  has got a 25 percent square foot range.  Can I find

16  anything out there?  I can't find anything.  Then you

17  go further.  Then you go further.  So you got nothing,

18  nothing, nothing.  All of a sudden, now you have got a

19  bunch of sales.

20            And you sit there and look at it and click on

21  it and you look at it.  No.  Go to the next one.  No.

22  You don't print all of those things out.  It's too

23  expensive to print all of those things out.  The ones

24  you think that look like they might be possible, those

25  are the ones you print out.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)            d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 44

1      Q.    Okay.  And how many -- are you able to go

2   through your file and see what he handed you as far as

3   the information relative to the comparables?

4      A.    It's in the file.

5      Q.    Okay.  So how many of those sales did you

6   look at and then you discarded for one reason or

7   another?

8      A.    I didn't discard any that he printed out.

9      Q.    Okay.

10      A.    Those printouts will be in the file.

11      Q.    So all of the sales that he gave you, you

12   used?

13      A.    Yes, because we are both experienced in

14   doing these types of searchs.  The old days, you had to

15   print everything out.  Today you don't have to print

16   everything out.  You just review everything on the

17   screen.  If it looks good, you can print it.  If it

18   doesn't look good, you go to the next one.

19      Q.    So there were no sales that you discarded;

20   is that accurate, relative to the ones that

21   Mr. Fletcher gave you?

22      A.    Printed out?

23      Q.    Printed out.

24      A.    Yes.

25      Q.    When were you hired in this case?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 45

1         A.    Back in August of 2010, I believe.

2         Q.    On an hourly basis?

3         A.    Yes.

4         Q.    What is your hourly rate?

5         A.    My rate is 250.

6         Q.    What about Mr. Fletcher's rate?

7         A.    Per this agreement, 175.

8         Q.    When you got this appraisal assignment was

9    this something new for you?  I don't mean in the sense

10   it was a new appraisal assignment.  But the type of the

11   appraisal assignment, the fact that you were reviewing

12   case law, had you ever done anything like this before?

13        A.    I have certainly been given appraisal

14   assignments where I have been given case law in order

15   to assure to the best of my ability as an appraiser

16   that I am consistent with the appellate cases.  This is

17   the first time I have structured an appraisal

18   specifically like this, which is actually very similar

19   to an imminent domain appraisal, actually.

20        Q.    What was your purpose in reaching an opinion

21   as to the "as if completed value?"

22        A.    To render an opinion of value of the "as if

23   completed value" based upon the fact that the project

24   was very near completion.

25        Q.    When Mr. Fletcher gave you the stack of

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 46

1          information, was it -- did he give you everything?  I

2          am talking about the land sales, the rental sales, the

3          sales that -- for the diminution in value.  Was he

4          responsible for all of that?

5                    MS. EDWARDS:  Object to form.

6                    THE WITNESS:  I --

7                    MR. ROSEN:  Do you understand my question?

8                    MS. EDWARDS:  There were a couple in there.

9               That is the nature of my objection.

10         BY MR. ROSEN:

11                   Q.    I will rephrase that.

12                   A.    Okay.

13                   Q.    When Mr. Fletcher gave you the stack of

14         sales, what was included in those sales?

15                   A.    Well, it wasn't all at one time.  It was

16         over a period of time, okay.  You start with the land.

17         So, you know, if -- you do the land first.  So we got

18         some sales.  We already had two.  I think we just

19         identified we had two.  So I am going, Bob, here is two

20         sales that I think we can use for this project.

21              I said, you know, let's see what else we can

22         find.  He comes back.  He has some land sales.  So we

23         have four land sales.

24              The next thing I think he worked on was

25         completing the cost approach.  We had numbers and data

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                              d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 47

1      that was provided to us, and I think we both spoke to

2      the general contractor -- the contractor.  We inspected

3      the property.  Different times we inspected the

4      property.  Came to a conclusion with the cost approach,

5      then started the sales comparison approach, and the

6      rental.  You do those hand in hand, side by side.

7           So then we did -- I think I got the improved

8      sales.  What do you think about these?  Okay, let's see

9      if they confirm and write them up.  So it's not, here

10     is a stack of papers; you know, do it all at one time.

11     It's piecemeal.

12          Q.   So you had discussions with him throughout

13     the process?

14          A.   Certainly.

15          Q.   Okay.  As far as the parameters that you

16     felt were appropriate, in terms of time tell me what

17     you think would be appropriate parameters for time

18     relative to your appraisal?

19          A.   Well --

20          Q.   Given the date of value of October 31, 2008.

21          A.   Our time is conditioned upon what is

22     available in the marketplace.  So that really controls.

23     So we have sales down prior to the October 31st date of

24     value.  We also consider sales that were after that

25     date of value.  Because we were doing a retrospective

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 48

1      opinion, it's up to the appraiser to select the logical

2      cutoff date for any market data to be considered, and

3      based upon the rules that I have to work under, uniform

4      standards of professional appraisal practice, we can

5      consider sales that occurred after the retrospective

6      date of value if it tends to support what we thought

7      the market was back then.  And so we did.  I think we

8      had sales that are six months after the date of value

9      and eight months before the date of value.

10          Q.    What would be the logical cutoff for sales

11     in this particular case?

12              MS. EDWARDS:  Object to form.

13              THE WITNESS:  I think what I applied was, I

14          think this was six months after the date of value.

15     BY MR. ROSEN:

16          Q.    And before the date of value, eight months

17     did you say?

18          A.    Well, again, it's a function of what market

19     I had out there to work with.  And based upon the

20     market data that we had, it was -- the oldest sale was

21     eight months, my recollection at this point in time.

22          Q.    How do I know what sales you looked at and

23     then decided were not appropriate?

24          A.    Well, you wouldn't, because the way the

25     system operates; when you -- again, I start off by

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                              d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 49

1       explaining, you start off by doing a very narrow

2       parameter for this subject, and if you find nothing on

3       your LoopNet search or you find nothing on your -- what

4       is the other one -- CoStar search, you expand your

5       parameters.  So I am not going to attempt to try to

6       compare this property to a 3,000 square foot office

7       building.  So, no, I didn't print that because it's not

8       even relevant.  So, did I consider it?  I didn't even

9       consider it.  It wasn't applicable.

10          Q.    In some cases have you prepared like a data

11      book relative to sales; if you go out and you do a

12      project, for example, an imminent domain project?

13          A.    Yes.

14          Q.    So you have a source of data that you can go

15      to and you can look at and then select your sales out

16      of that information?

17          A.    Because we are -- we use a data book because

18      we have multiple like kind of properties that are

19      similar.  So I may have 10 commercial sales.  Will

20      these three apply to that subject and those four to the

21      next one and these five to this one, but they don't all

22      apply to the same property.

23          Q.    Okay.

24          A.    But if we printed out a sale, a potential

25      comparable to analyze and we ended up not using it, we

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                              d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 50

1      keep it in the file.  It's in the file.

2           Q.    Okay.

3           A.    But --

4           Q.    Do you think you have sales in there other

5      than the ones that you used in your appraisal report?

6           A.    There might be one or two.  Again, we have

7      had enough experience to not waste paper on printing

8      something that is not relevant.

9           Q.    What about as far as the location of the

10     sales, what do you consider to be -- given the subject

11     property is located in Charlotte County, what do you

12     think is the logical end of an appropriate location?

13          A.    I don't think there is a logical end to a

14     location, because you can find like kind properties in

15     other geographical areas that have the same market

16     appeal and marketability and basically the same rent

17     level, basically the same sales value as an investment

18     property.

19          Q.    So in terms of specifics, you use sales --

20     you use the sale in Hendry County, Hillsborough County

21     and --

22               MS. EDWARDS:  Collier.

23               MR. ROSEN:  I am sorry?

24               MS. EDWARDS:  Collier is your third.

25     BY MR. ROSEN:

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 51

1        Q.    Collier.  So you don't see -- you see those

2   geographically as being appropriate sales?

3        A.    Well, I think you are misinterpreting the

4   sales.  We did not use those sales as a direct

5   comparison to define a specific rental value or per

6   square foot sales price value for the subject property.

7   We used those sales to derive a percentage adjustment,

8   and that percentage adjustment is for the discount for

9   an incompleted project.

10        It is consistent with the textbook approach

11   and the valuation of detrimental conditions in real

12   estate appraisals.  Again, we did not use those as

13   direct sales to apply to a value indication -- a market

14   value indication on the subject property.

15        Q.    Okay.  So as far as the extent of the

16   location, could you have viewed sales outside of

17   Florida?

18        A.    Could have, yes.

19        Q.    Would that be appropriate?

20        A.    If I am using it to derive an indication of

21   an adjustment factor specific to a property, as long as

22   the basic parameters are the same, yes.

23        Q.    Relative to this particular assignment, you

24   wouldn't have any problems using sales outside the

25   state of Florida -- let me strike that.  When would it

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 52

```
 1        be appropriate to use sales outside the state of

 2        Florida for the sales you used in your diminution in

 3        value?

 4               MS. EDWARDS:  Object to form.

 5               THE WITNESS:  When I couldn't find any other

 6           sales within the state of Florida.

 7        BY MR. ROSEN:

 8           Q.   Okay.  And what about the -- what

 9        specifically were you looking for in terms of comparing

10        the percentage adjustment to the subject property?

11           A.   I was looking at other -- we'll call them

12        failed projects, for whatever reason, and what they

13        sold for in order to identify a diminution in value.

14        And I wanted that percent.  And because I got a percent

15        for a like kind property -- it's not exact but like

16        kind -- then I can apply that percent of market value

17        for them to mine.  I am looking for that percentage

18        adjustment.  I am not looking for the dollar value that

19        they have in theirs.

20           Q.   Okay.  So in your opinion does the

21        geographical location make any difference at all?

22           A.   Oh, certainly it can.  You need to look at

23        and make sure that it's reasonable and consistent with

24        overall rental values and overall underlying value of

25        the real estate involved.  I can't go to Palm Beach and
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 53

1          use a project downtown.  That would be inappropriate.

2          But I can go to Collier County.  Because land values

3          were in the same brackets and the approved values were

4          in the same brackets, and the rents are in the same

5          brackets, it's consistent.

6               Q.    Did you find any failed projects in

7          Charlotte County?

8               A.    No, we didn't.  I will also add, they are

9          not easy to find.

10              Q.    What about Sarasota County?

11              A.    None that have gone through the process.

12              Q.    What do you mean by that?

13              A.    That have been repurchased.

14              Q.    So tell me about the process you used for

15         determining the appropriate comparables that you used

16         in your appraisal report to determine the diminution in

17         value.  What is the process?

18              A.    We sought like kind office properties that

19         were partially completed, the project stopped for

20         whatever reason, the loan was sold and the property was

21         resold.  And what the discount was versus what the

22         underlying market value would have been; just like we

23         did with the subject.

24              Q.    And how many failed projects did you have to

25         choose from?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 54

1          A.     These four is what we found.

2          Q.     These were the only four that were --

3          A.     That we found.

4          Q.     Okay.  And how do you go about -- who went

5     about finding these particular sales?

6          A.     Bob.

7          Q.     Okay.  And what discussions did you have

8     with him relative to that?

9          A.     How are we going to find these, Bob?  It's

10    just -- there is not a click that you can put on the

11    screen, failed project, resold, you know.  You have to

12    hunt and peck, hunt and peck, make phone calls.

13         Q.     Okay.  So you are not talking about

14    something that you can plug into one of the services

15    then?

16         A.     A search program, no.

17         Q.     And when you talk about hunting and pecking,

18    telephone calls is the way that it was done in this

19    particular case?

20         A.     No.  Primarily it's done through -- well,

21    let's go look and see.  It was done through LoopNet,

22    property appraisers office.  So what we found is just

23    sitting there putting in perimeters and just looking,

24    clicking this listing one by one to see if anything

25    matched ours, what we are were looking for.  So we have

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 55

1         that kind of data that we were searching for.

2             Q.    Okay.  So he is plugging it into --

3             A.    Well, you are plugging in office buildings.

4         Remember I talked about when we have a 17,600 square

5         foot office building, we want to find these parameters.

6         We find nothing, you go to these parameters.  You find

7         nothing, you go to these parameters.  So now we are

8         going to come back and look for office buildings that

9         have projects that have failed for whatever reason.  So

10        that is a whole different search you have to go

11        through.  It is time consuming to sit there and plug in

12        office buildings sales and click, click and click and

13        look and look.

14            Q.    And so what information are you looking at

15        based on the computer screen to show you whether it's a

16        comparable as you scroll through it?

17            A.    A good example would be -- it's hard to see

18        on this photograph.  On the photograph what you see is

19        a building that is clearly not complete and it's got a

20        big chain link fence around it.  That is a good sign

21        that something is going on with that property.  Let's

22        click that one.  Don't let that one get away.  That is

23        the type of thing, you have to sit there and search

24        for.  Then you say, oh, okay.

25            Q.    Other than the pictures, is there any

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 56

1      information relative to -- that is listed on the screen

2      that would give you some indication that it's a

3      foreclosure sale?

4          A.   No.   It doesn't say that on the screen.   But

5      you just have to look at it.   Okay, why does this one

6      look like this.   It's just truly a hunt-and-peck

7      process.

8          Q.   Okay.

9          A.   And Bob is a lot cheaper to do that than I

10     am.

11         Q.   I understand.   So do you know -- you know

12     what he provided you with.   But as far as, you know,

13     going through the process and you indicated that there

14     weren't any failed projects that you found in Charlotte

15     County.   Is that correct?

16         A.   No.   No like kind projects we found in

17     Sarasota or Charlotte County or Manatee County.

18         Q.   Okay.   Did you have a discussion with him

19     about this?   Was he coming back to you and saying, here

20     is what I found?   What did he tell you?

21         A.   They are hard to find.   And this is what we

22     found.   I say, well, let's call, you know, Lee Dalido

23     and Ian Black and see if they know of any.   They are

24     the two commercial brokers in Sarasota.   See if they

25     got any leads on any property that is not showing up in

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 57

1       the LoopNet search.  We have a couple of bank clients

2       that have very similar properties but they haven't sold

3       them.  They are, you know, 90 percent finished but they

4       are sitting there vacant unfinished.  The bank has

5       taken them back but they haven't sold it, so I use them

6       as a comp because it hasn't been sold.  I can't derive

7       what that discount is.

8            Q.    And the -- who made these telephone calls,

9       you or Mr. Fletcher?

10           A.    I think I called Ian.  I think he called

11      Lee.

12           Q.    Okay.  And what information did you find out

13      from them?

14           A.    They didn't know of any.

15           Q.    Okay.  And so is the way these sales were

16      derived in light of that information -- or lack of that

17      information was your search limited to -- or Mr.

18      Fletcher's search limited to looking at pictures to see

19      whether they were fully completed of office projects?

20           A.    Again, what you do -- it's not just looking

21      at the pictures.  That is just one example of a key

22      indicator is, you plug in a search and you will get

23      five pages of LoopNet data.  You sit there and look at

24      each one.  And you are looking at the price and you are

25      looking at the description and is there something not

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 58

1     right about that.  And then you go in behind it, look

2     behind it a little bit to see what else -- what

3     information they have.  And then you go to the next

4     one.  It's just a hunt and peck, hunt and peck.  You

5     think you find something, well, you print it.

6            So then you can start doing some research on

7     it and say, is this what we think it is.  And that is

8     the process use.

9        Q.    Okay.  So, for example, when one of the

10    sales that you used in Hillsborough County, at what

11    point do you determine geographically that it's too far

12    away or too remote from the subject property to have

13    any kind of value?

14       A.    Again, it's not looking at the value.  We

15    are looking at this property.  We'll call it a

16    comparable.  In order to determine what the discount

17    percent that was applied based upon this specific

18    market factors, and that is how we go through this

19    analysis on the back page and go through the

20    confirmation of the construction cost and we are

21    looking at the rents.  Now, the rents are very

22    consistent with our subject property.  It doesn't have

23    to be exact, but consistent.

24            So I have got the brokers telling me I am $15

25    a square foot rent.  This is what it should rent for.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 59

1        We go through the analysis and find out what that

2        discount is.  That is what we are looking for, that

3        discount.

4             Q.    As far as the -- isn't that, though, all

5        tied to all of the other economic factors associated

6        with differences in geography, differences in the

7        rental market in Hillsborough County versus the rental

8        market in Charlotte County?

9             A.    You can't county-izing [sic] it.  There is

10       always submarkets within every geographic county.

11       Again, if I have got a property that has the same rent

12       level as my subject; rent goes to value, value

13       separated between land and improvement.  So I am

14       consistent in looking at the underlying value of that

15       comparable we are looking at.

16            Q.    Is it appropriate to make any adjustment if

17       the property is located in Hillsborough County?

18            A.    If I was planning to use it as a direct

19       comparable to support a market value opinion for the

20       subject; yes, it may well be.  That's not what I am

21       doing with these comparables.

22            Q.    And what -- you mentioned the -- you believe

23       that you did it in accordance with certain textbooks or

24       treatises?

25            A.    Uniform Standards of Professional Appraisal

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)
d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 60

1      Practice.

2           Q.    Okay.  So what does USPAP say relative to

3      using it for the purposes that you used it here?

4           A.    USPAP doesn't say specifically one way or

5      the other.  What USPAP says, apply the correct amount

6      of standards of the appraisal profession; and,

7      therefore, that is what I have done, utilizing the

8      analysis of detrimental conditions and valuation of

9      real estate textbook by the appraisal institute.

10          Q.    So getting back to the issue of sales

11     outside of the state, if you found that the rental

12     value was the same as Charlotte County you wouldn't

13     have any problem using a sale for this purpose outside

14     the state of Florida?

15          A.    Not just the rental value.  We have to look

16     at other factors; underlying land value, the

17     demographics of the area basically consistent with our

18     market area.  You know, if I didn't have any sales here

19     and those are what the sales were, you use them.

20          Q.    How do you --

21          A.    I will give you an example.  If you are

22     doing an appraisal in Homer, Alaska, can you use a sale

23     in Anchorage, Alaska, 80 miles away?  Guess what; they

24     do, because that is the only comps they got.

25          Q.    Did you make any adjustments associated with

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 61

1    your three comparable sales as it relates to the

2    diminution in value?

3        A.    No.  Again, I am only looking at deriving

4    that percentage impact.

5        Q.    You talk about -- let me ask you as far as

6    the timing.  Did you use between six months and a year

7    as your -- one of your assumptions for the sale of the

8    subject property?

9        A.    As to the question of the marketing time?

10       Q.    Yes.

11       A.    Whatever we stated in the report.  I am sure

12   we sat down and --

13       Q.    Look at page 2.  With respect to the

14   subject, we estimate the marketing time to be between

15   six and twelve months when appropriately disposed and

16   listed pricing on the open market as of October of

17   2008.

18       A.    Right.

19       Q.    Why did you use that period of time?

20       A.    Based upon the comparable sales that we did

21   rely upon to render an opinion of value to the subject

22   property, we looked at the marketing time and exposure

23   time that those properties had been offered for sale.

24       Q.    When you -- isn't that inconsistent if you

25   have a date of value of October 31, 2008, and you are

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 62

1          talking about a marketing time a year later?  Wouldn't

2          that impact your value?

3                    MS. EDWARDS:  Object to form.

4                    THE WITNESS:  I don't understand the question.

5          BY MR. ROSEN:

6               Q.    Let me ask it -- when you typically do an

7          appraisal report, say, for a nonforeclosure sale, say,

8          the sale of an office or a residence --

9               A.    It's called a bank sale.

10              Q.    No.  I want to ask you -- before we get into

11         that, I want to ask this question.

12              A.    Okay.

13              Q.    Don't you typically assume 60 days?

14              A.    No.

15              Q.    Okay.  What do you use as far as the

16         marketing time when you -- if you were to appraise an

17         office building?

18              A.    I use the definition of market value, the

19         property exposed and on the market for a reasonable

20         period of time.  That is based upon what our sales

21         indicate that those properties were exposed to the open

22         market and how long it took them to sell it.

23              Q.    Okay.  So you don't use -- there is no

24         typical time associated with your reports in that

25         situation?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 63

1          A.    No.   Each report stands on its own.   Each

2     property may have a different marketing time.   Depends

3     upon the market conditions at that point in time that

4     we are doing the appraisal.

5          Q.   Let's talk about the market as of

6     October 31, 2008, with respect to developments of

7     office buildings.   What was going on funding wise at

8     that time, the ability to get funding to do

9     developments?

10          A.   At that point in time things were coming to

11     -- slowing down significantly, if not coming to a halt.

12          Q.   Okay.   And then as time marches forward how

13     would you characterize the ability to get funding?   Did

14     it become worse?

15          A.   I would say yes.

16          Q.   Okay.   And take me through what time period

17     that you are talking about.   As you go into October --

18     from October 31, 2008, say, to October 31, 2009, how

19     would you characterize that time period with respect to

20     funding?

21          A.   I think it was very difficult, if not

22     impossible, to get new funding.   Projects that were in

23     the works were being told to relocate their loans.   We

24     did several appraisals for that purpose.   Basically the

25     market just -- everybody pulled in -- the banks pulled

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 64

1        in their financing.

2              Q.    And as into 2010, how did things change?

3              A.    Still the same.

4              Q.    Okay.  So how would you characterize it?  I

5        don't want to put words in your mouth.  From 2008 to

6        2009 it got worse and then in 2010 it stayed the same,

7        or how would you -- how would you characterize that?

8              A.    I would characterize it as of the end of

9        2008 banks simply stopped lending.  In 2009 as loans

10       became due or for renewals banks were telling their

11       customers to relocate their loans.  They weren't going

12       to renew the loan or continue the loan.  And they just

13       simply stopped lending.

14             Q.    So did it stay pretty -- has it stabilized

15       from 2008 to 2010, or is it getting worse as time

16       marches on?

17             A.    Is what getting worse?

18             Q.    The ability to obtain funding.

19             A.    There isn't -- basically I don't know of any

20       funding that was available from last quarter of 2008

21       through 2010.

22             Q.    Okay.  Do you know what the terms of this

23       loan were?

24             A.    I have copies of those documents; but I

25       don't recall them off the top of my head, no.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 65

1          Q.     How would you characterize those loan terms

2     as of the date of value?

3          A.     Well, considering I don't recall them off

4     the top of my head, I am not sure I can answer your

5     question.

6          Q.     Fair enough.  Do you have that -- can you

7     look at that and answer the question for me?

8          A.     I would have to study the loan terms.

9          Q.     Yes.

10          A.     As I recall, the fairly standard commercial

11     loan agreement moving forward to fruition to completion

12     of a project, I think the interest is 7 or 7 and a

13     quarter percent.  The loan agreement looked pretty

14     standard from the ones we've seen.

15          Q.     Do you know if the loan was in default?

16          A.     Not to my knowledge.

17          Q.     What documents did you receive prior to

18     completing this assignment?  You had talked about the

19     appraisal report and the loan documents.  Did you

20     receive any other documents?

21          A.     Cases.

22          Q.     Cases?

23          A.     Construction costs, construction draws, a

24     copy of the complaint.

25          Q.     Construction plans?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 66

1          A.    Yes.  Cost estimates, things like that.

2          Q.    We are talking about the documents.  I don't

3     know that you received --

4          A.    Yes.

5          Q.    I don't know that we finished that up.  You

6     were telling me the documents that you received.

7          A.    (Indicating.)

8          MS. EDWARDS:  Can I take a quick look at that?

9     BY MR. ROSEN:

10         Q.    Who verified the sales in your appraisal?

11         A.    Other than the two that we pulled from a

12    previous report, it would be Bob.

13         Q.    And what is -- do you know what his practice

14    is as far as verification?  Does he use verification

15    sheets and make notes?

16         A.    He writes on the printout that whatever we

17    get, whether it's LoopNet or CoStar, he actually writes

18    on those and those go into the file.  And then on each

19    comparable write-up there is a confirmation source and

20    phone number of who we spoke to and a summary of what

21    we found.

22         Q.    Okay.  But as far as questions, is there --

23    do you have like a sheet of paper that you go through

24    and ask, you know, the same questions with all of your

25    verifications?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 67

1          A.     No, we don't use no questionnaire.

2          Q.     Okay.  So whatever is -- we don't know what

3     questions were asked, but we know some of the responses

4     because that is on the sheets?

5          A.     Correct.

6          Q.     So would you have any information over and

7     above what is contained in the appraisal report?

8          A.     The handwritten notes are on each one.

9          Q.     Describe the adjacent uses relative to the

10    subject property.  What is next door?

11         A.     Well, it's boarded by roadways.  Immediately

12    to the east of the subject is residential property.  To

13    the south on the same side of the street is the other

14    commercially zoned properties.  The Lacasa Strip

15    Center, it's just two blocks away, a block away.

16         Q.     What is that, Lacasa Strip Center?

17         A.     It's an L-shaped little commercial center.

18    It has retail and office type uses in it.  I have an

19    aerial here.  It shows the residents in the back, the

20    residents on the side.

21              The frontage parcels are zoned commercial.

22    Whether they are used commercial/residential;

23    nonetheless, they are zoned commercial.

24         Q.     Where is the nearest office building?

25         A.     Pure office, only office, or office uses?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

1          Q.      Office uses.

2          A.      Within a few blocks.  There is a very

3    similar property sort of across the street to the

4    northwest, a little office building complex.  There is,

5    probably, as of right now 90 percent occupied.

6          Q.      As far as your discussion, you say in your

7    appraisal work there were discussions with market

8    participants and I think brokers.  And I have asked you

9    the question as far as who you spoke with.  What is

10   that gentleman's name again?

11         A.      Ian Black.

12         Q.      Okay.  What is -- is he a real estate

13   appraiser?

14         A.      He is a real estate broker, very heavy in

15   office and commercial properties.

16         Q.      Okay.

17         A.      And then the other guy is Lee DeLieto.  He

18   is with Michael Saunders.  He is again heavy in

19   commercial office and industrial properties.

20         Q.      Anybody else?

21         A.      The individual brokers we may have spoken to

22   concerning the various sales and other properties that

23   we looked at are noted in the write-ups.

24         Q.      Other than that?

25         A.      I am sure we -- I don't know.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                 d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 69

1          Q.     Okay.  Are you relying on any other

2     predicate experts for your opinion in this case?

3               MS. EDWARDS:  Object to form.

4               THE WITNESS:  We --

5     BY MR. ROSEN:

6          Q.     It would appear the answer is no to that?

7          A.     Well, we spoke to the contractor.  We wanted

8     to really understand how geared up they were in October

9     of 2008 relative to finalizing this particular project,

10    confirm that they were actively under construction.

11         Q.     Who did you speak with, or did Mr. Fletcher

12    do that?

13         A.     We both spoke to him at one point in time.

14    His name escapes me.  It's in the file.  Again, I am

15    terrible with names.  Go with numbers, but I am not

16    good with names.

17         Q.     How did you conclude that the subject

18    property was 70 percent completed overall?

19         A.     Looking at the condition of the two front

20    buildings -- and not looking at them in October of

21    2008.  Looking at the condition of the rear building;

22    looking at the construction budget; the draws; the

23    dollars that have been expended; discussions with the

24    contractor, discussions with Mr. Edwards, who was the

25    project manager for lack of a better term; our

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                        d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 70

1       familiarity understanding of construction having

2       appraised similar properties over the years and been

3       retained by banks to go back and do construction draws

4       on inspections; the fact that my daddy was a

5       contractor, so I have a little bit of understanding

6       about the process; again looking at the property.

7               Q.    What specific approvals were in place as of

8       the date of value?

9               A.    As far as the zoning and site plan

10      approvals?

11              Q.    Yes.

12              A.    They had received building permits to

13      construct the subject property as per the plan of

14      specifications.  The property is already zoned.

15              Q.    Did you rely on any kind of economic or

16      marketing studies in this case?

17                  MS. EDWARDS:  Object to form.

18                  But go ahead and answer.

19                  THE WITNESS:  No marketing studies.  We

20                  certainly considered the economics of the market

21                  area with the general economy at that point in

22                  time of October of 2008 and the economics of this

23                  project.

24      BY MR. ROSEN:

25              Q.    Did you have any discussions with any bank

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 71

1       officials, representatives relative to this case?

2            A.    Well, only -- let me back up.  Only in the

3       sense that I questioned a couple of my bank clients,

4       whether they knew of or had knowledge of a similar

5       situation where the project was halted for whatever

6       reason and was subsequently resold in its unfinished

7       condition and what discounts were applied.

8            Q.    And did they give you a percentage discount

9       or --

10           A.    No.  Not specific.

11           Q.    As far as your conclusions in this case, you

12      concluded that the diminution in value -- strike that.

13      You concluded that the improvements on the data value

14      had no contributory value; is that correct?  Actually

15      they had a negative value; is that right?

16           A.    No.

17           Q.    Okay.  The damages that you -- your

18      diminution in value was 1,632,000 correct?  Page --

19      actually, that's in your cover letter.  Is that

20      correct?

21           A.    Yes.  Diminution in value 1,632,000.

22           Q.    So you were attempting to value the loss of

23      funding as of the date of the value; is that correct?

24           A.    Looking at the actual direct compensatory

25      damages as of the date of value.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                     d35bd089-f6e2-457a-9c7a-23739d7f1ea7

1        Q.    Okay.  And that is attributable to the loss

2        of funding, correct?

3        A.    Yes.

4        Q.    So you determined that the Pro Rata value in

5        the before situation of the subject property -- hang on

6        a second.  You estimated the loss of value due to the

7        repudiation at $1,632,000, right?

8        A.    Yes.

9        Q.    Okay.  So what was the value of the vacant

10       land after the repudiation?

11       A.    I didn't value the land as vacant after the

12       repudiation.

13       Q.    But your damages -- does the building in

14       your opinion have any contributory value to the real

15       estate after the repudiation?

16       A.    As of October 31, 2008?

17       Q.    Yes.

18       A.    Did it have a value?

19       Q.    Yes.

20       A.    Well, $768,000.

21       Q.    Okay.  And what was the value of the land

22       before the repudiation?

23       A.    810, I think I have.

24       Q.    Right.  So based upon that, doesn't that

25       illustrate that the improvements have no contributory

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 73

1          value and the value of the building is completely lost?

2          A.    It implies that, yes.

3          Q.    Okay.  So would you agree with me that based

4     upon your appraisal report that the building

5     improvements have a negative value after the

6     repudiation?

7          A.    Yes.

8          Q.    Okay.  And how did you -- why is that?  Why

9     is it that a building that is 70 percent overall

10    completed would have no value to a prudent purchaser?

11         A.    A prudent purchaser at that point in time

12    would need to be, in my opinion, someone who can pay

13    cash for the property, because of lack of funding, lack

14    of financial ability.  And what the market data tells

15    us is there is a direct discount that is applied to

16    these types of properties that are partially completed.

17    In addition to that, there is a financing consideration

18    of an additional discount which we concluded was 28

19    percent.  And a prudent investor is going to use those

20    to his or her advantage in order to buy an asset;

21    because now they have got to buy that asset, they have

22    to work out the conflicts between the contract and the

23    subcontractors who may have potential liens on the

24    property, gear the project back up and they may in fact

25    have to get new building permits under a new name.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 74

1        There is time delays, cost completion and risks to that

2        investor.

3             Q.    Okay.  I understand what you are saying.  If

4        a client came to you and asked you in your opinion

5        whether the subject property after the repudiation,

6        whether the building improvements have any value, you

7        would tell them no, they don't?

8             A.    I would tell them that we can do an

9        appraisal and tell you what it's worth.

10             Q.    So based upon your -- the information that

11        you considered in this case, you think that supports

12        the fact that the improvements have a negative value?

13             A.    The data speaks for itself.  There is a

14        negative economic impact direct to this project due to

15        the loss of funding.  Inability to move forward to

16        complete the project.

17             Q.    Okay.  No.  I understand that there is a

18        negative impact.  But with respect to somebody coming

19        in and purchasing the property, it would be your

20        opinion -- your advice to them that based upon the

21        appraisal report that you completed here that those

22        improvements, that they shouldn't pay anything for

23        those improvements based upon your assessment?

24             A.    All I can tell you is what the market value

25        is and what that particular buyer chooses to do with

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 75

1          the improvements or the strength of the improvements

2          and do an alternative use for the land.  It's up to

3          that particular buyer.  That wasn't the scope of my

4          assignment.  My assignment was to render this opinion.

5               Q.    What market evidence do you have that there

6          is a -- based upon the sales that you considered, that

7          a prudent purchaser would not pay any money associated

8          with these improvements?

9               A.    I am looking at the other sales that were

10         incompleted projects, what they sold for, what it was

11         going to cost to complete the project and what that

12         discount was.

13              Q.    Are you able to make any determination to

14         the value of the improvements associated with your

15         comparable sales related to the diminution in value?

16              A.    We didn't segregate the improvements to the

17         land.  The comparables we have in the back relative to

18         the diminution in value did not segregate the

19         improvements from the land.  As a matter of fact, they

20         accepted the improvements on the land.  They then

21         proceeded to finalize and finish those improvements

22         that were on the land, what it should have been ready

23         for, what the market was for those properties; and then

24         we could derive what the discount was based on what

25         they paid for those properties.

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 76

1          So clearly under the comparable we have, they

2     considered some value for those improvements because

3     they purchased and then proceeded to finalize or finish

4     the project; completed, rent.  And they were able to do

5     that because they paid less for the property.

6          Q.    Does the land value change as a result of

7     the repudiation of the loan?

8          A.    I can't answer that.  I didn't address that

9     question.  The overall value of the property has

10    changed.

11         Q.    What do you think if somebody came in

12    hypothetically and purchased this property; do you

13    think that they would raise the improvements?

14         A.    No.

15         Q.    Would you advise them that they should raise

16    the improvements?

17         A.    You mean under your hypothetical?  No.

18         Q.    Why not?

19         A.    It's a decent project.  To get it for the

20    right price, they can afford to spend the money to gear

21    it back up to complete it and to lease it to make a

22    profit.

23         Q.    Are you -- hang on a second here.  Who is

24    Mission Capital?

25         A.    A company out of New York that banks

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 77

1        package.  Basically they are bad loans, they are bad

2        product.  Mission Capital then solicits bids for these

3        properties to basically bid it out and see what they

4        get for it.  So let's take an example.  M&I Bank will

5        have a property in its portfolio.  They'll send it up

6        to Mission Capital.  They'll get a call and they have

7        got two hours to make a decision whether to accept or

8        reject the bid that is offered to them.

9            Q.    Let's talk about your diminution in value.

10       You say here on page 80 of your appraisal report, the

11       comparables examined indicated discounts of 40 percent,

12       51 percent and 40 percent respectfully, correct?

13           A.    Yes.

14           Q.    And then in addition to that, you concluded

15       to a 40 percent diminution in value based on those

16       three comparable sales?

17           A.    Yes.

18           Q.    And then on top of that, you determined that

19       another 28 percent was appropriate, correct?

20           A.    Yes.

21           Q.    Can you explain to me the basis for that

22       opinion?

23           A.    Yep.  I think I wrote it out here for you.

24       As we looked at those particular three that we just

25       discussed, we were able to identify a document that

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

```
                                                        Page 78
 1        discount was applied.  What we were not able to verify

 2        and document specifically for each of those is what

 3        that mortgage sold for.

 4              So bank A sells the mortgage on -- let's just

 5        pick a property -- for 20 cents on the dollar.  We

 6        can't verify that.  That is not public domain

 7        information.  We have a range of what that discount is.

 8        That is Mission Capital, for example.

 9              It says if those discounts we form off those

10        mortgages, you know, we are getting from 20 to

11        60 percent discount and sometimes even higher.  So

12        while we've got confirmation of the subsequent sale of

13        the property and what that discount was, we don't have

14        the original discount from the bank to the wholesaler

15        who is buying that mortgage.  And that guy is turning

16        around and selling it.  This is the sale we have.  We

17        don't have this discount.

18              But we know that range is 20 to 60 percent or

19        higher.  We have confirmed that information.  So what

20        do I apply out of that range?  I can apply 20 percent

21        or I can apply 60 percent.  Well, if I apply

22        60 percent, plus the 40 percent discount, that is

23        100 percent.  That is not logical.  You can't do that.

24        So it has got to be something else.

25              Then you sit back and go, all right, within
```

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)

d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 79

1    this project what is reasonable, what is logical in

2    order to apply an appropriate discount.  I got the

3    support for 20/60.  Where am I going to pick in that

4    number?  You want to pick in that number with what is

5    consistent with what the ultimate analysis we've done

6    here.  That works out to about 28 percent.

7        Q.    When were the photographs taken in the

8    appraisal report?

9        A.    On the subject property?

10       Q.    Yes.

11       A.    There should be a date on there, the date of

12   the inspection.

13       Q.    And who inspected the site?

14       A.    Well, Bob first inspected it.  I inspected

15   it subsequently.

16       Q.    When did you inspect it?

17       A.    I inspected it, probably, in November and

18   again this week.

19       Q.    Okay.  And if I drove out there today what

20   does it look like?

21       A.    Like that, just like that.

22       Q.    Was there a lease sign out in front of the

23   property?  (Indicating.)

24       A.    No.  I didn't see one when I was there.  I

25   don't recall one.  When I just reinspected it this last

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 80

1      week, I don't remember seeing that sign.

2              MS. EDWARDS:  Can we indicate for the record

3          what we are talking about too.

4      BY MR. ROSEN:

5          Q.    This is page 20 of your real estate

6      appraisal report; is that correct?

7          A.    Yes.

8          Q.    And that's the picture at the bottom of the

9      page, which appears to show half of a leasing sign?

10         A.    Yes.

11         Q.    It says now leasing?

12         A.    Yes.  I don't believe that was there when I

13     looked at it.  There is more weeds.

14         Q.    Do you know what permits would be required

15     to restart the construction or whether new permits

16     would be required?

17         A.    I can tell you, yes, new permits would be

18     required.  I think the first thing they would have to

19     do, to my understanding, would be call for inspection

20     in order to determine what of the existing improvements

21     are -- will pass code or will not pass code, what will

22     have to be done to upgrade what is there to the current

23     code.  And I am sure they would have to submit a full

24     application for a new building permit.

25         Q.    Do you anticipate making any changes to your

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)          d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 81

1        appraisal report; additions, deletions, modifications

2        in any way?

3             A.    Plans, no, I don't.

4             Q.    Let me look through your file here.  What

5        did you bring with you today?

6             A.    Everything that was consistent with the

7        duces tecum.

8             Q.    And this is -- you are handing me two --

9             A.    This is just my appraisal.  It has got the

10       standard rule from Newspath relative to retrospective

11       appraisals to make sure I was consistent with the

12       uniform standards.  Some notes, definitions, terms.

13            Q.    Do you have anything other than these two

14       books here?

15            A.    I do.

16            Q.    What else do you have?

17            A.    I have a file.

18            Q.    Okay.  Let's see it, please.  Do you want me

19       to tab --

20                  (Off the record.)

21       BY MR. ROSEN:

22            Q.    I would like a copy of the appraisal report

23       and then these documents that I tabbed here.  So we are

24       done with this book.

25            A.    You want it in color?

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 82

1          Q.    No.  Black and white is sufficient.  What do

2     you charge for copies?

3          A.    Ten cents for black and white and so much

4     for color.

5          Q.    May I look at this?

6          A.    Yes, sir.  You can look at almost anything I

7     have got.

8          Q.    And --

9               MS. EDWARDS:  You are on the record again.

10    BY MR. ROSEN:

11         Q.    This is your appraisal report?

12         A.    Yes.

13         Q.    You have some nice color pictures here.  I

14    have everything, because I have a copy of your

15    appraisal report.  In fact, we are attaching this as

16    Exhibit A to your depo.

17               I would like a complete copy of this.  For the

18    record, this is --

19         A.    We will just call it the green file.  I will

20    give you everything in there.

21               MS. EDWARDS:  Do you want a copy of the books?

22               MR. ROSEN:  Maybe.  I don't think I can copy

23         those.  I think they are copyright.

24    BY MR. ROSEN:

25         Q.    You have the Appraisal Institute, Thirteen

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 83

1      Edition, and Real Estate Damages from the Appraisal

2      Institute.  Do you consider these authoritative

3      treatises?

4           A.    Yes.

5           Q.    This one I have, Real Estate Valuation in

6      Litigation, is this an authoritative treatise?

7           A.    Yes.

8           Q.    The dictionary of Real Estate Appraisal, is

9      that an authoritative treatise?

10          A.    Yes.

11          Q.    Did you -- let me see.  You have this tabbed

12     here.

13          A.    That may not be relevant.

14          Q.    Insurance claims.

15          A.    No.

16          Q.    It doesn't look like it applies.  Mr. Bass,

17     is that your complete appraisal file for this case?

18          A.    Yes, it is.

19               MR. ROSEN:  I don't have any further

20          questions.

21               MS. EDWARDS:  I don't have any.

22               MR. ROSEN:  I am going to hold off for right

23          now.  I will take your card, though.

24               (THEREUPON, the right to read and sign the

25          deposition and/or the right to waive reading and

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                    d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS,  MAI, AICP, EAC - 3/25/2011

Page 84

1          signing were explained to the deponent; whereupon

2          the deponent waived that right, and the taking of

3          this deposition was concluded at 12:45 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7

Page 85

1                    CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF SARASOTA

4

5                    I, Patricia A. Pilarski, CSR, the

6        undersigned authority, certify that RICHARD W. BASS,

7        MAI, AICP, EAC personally appeared before me on March

8        25, 2011, at 10:10 a.m., and was duly sworn.

9                    WITNESS my hand and official seal this

10       6th day of April, 2011.

11

12

13

14       _____
              Patricia A. Pilarski, CSR
15            Notary Public, State of Florida
               Commission No.:  EE8061
16            My Commission Expires:  7/31/2014

17

18

19

20

21

22

23

24

25

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)              d35bd089-f6e2-457a-9c7a-23739d7f1ea7

RICHARD W. BASS, MAI, AICP, EAC - 3/25/2011

Page 86

1                    CERTIFICATE OF COURT REPORTER

2

       STATE OF FLORIDA
3
       COUNTY OF SARASOTA

4

5                    I, Patricia A. Pilarski, CSR, do hereby

6        certify that I was authorized to and did

7        stenographically report the deposition of Richard W.

8        Bass, MAI, AICP, EAC, that a review of the transcript

9        was not requested; and that the foregoing transcript is

10       a true and correct record of my stenographic notes.

11

12                   I FURTHER CERTIFY that I am not a

13       relative, employee, or attorney, or counsel of the

14       parties, nor am I a relative or employee of any of the

15       parties' attorney or counsel connected with the action,

16       nor am I financially interested in the action.

17

18                   DATED this 6th day of April, 2011.

19

20

21

22

23       _____

24                   Patricia A. Pilarski, CSR

25

Electronically signed by Patti Pilarski (001-116-965-9616)
Electronically signed by Patti Pilarski (001-116-965-9616)                d35bd089-f6e2-457a-9c7a-23739d7f1ea7