UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PLACIDA PROFESSIONAL CENTER,
LLC, a Florida Limited Liability Company,
MICHAEL B. EDWARDS and SHERYL A.
EDWARDS,

            Plaintiffs

vs.                                   Case No.8:09-CV-02221-JSM-MAP

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
FREEDOM BANK,

            Defendant.

_____/

**DEFENDANT, FDIC AS RECEIVER'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF
LAW IN SUPPORT THEREOF**

      Defendant, Federal Deposit Insurance Corporation as Receiver for Freedom Bank

("FDIC as Receiver"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local

Rule 3.01 of the Middle District of Florida, hereby files its Response in Opposition to Plaintiffs,

Placida Professional Center, LLC ("Placida") and Michael B. Edwards ("Michael Edwards") and

Sheryl A. Edwards' ("Sheryl Edwards") (Michael and Sheryl Edwards collectively the

"Edwards") Motion for Summary Judgment as to Count II of Plaintiffs' First Amended

Complaint, and as grounds therefor, more particularly appearing in the Incorporated

Memorandum of Law in Support Thereof, states as follows:

**I.    INTRODUCTION**

    This case arises out of the FDIC as Receiver's disallowance of Placida's administrative claim

for repudiation damages pursuant to the Financial Institutions Reform, Recovery, and

Enforcement Act of 1989 ("FIRREA"). The FDIC as Receiver exercised its right under FIRREA to repudiate the continued funding of Placida's construction loan because the continued performance would be "burdensome" and the repudiation would "promote the orderly administration of the failed institution's affairs". [Docket No. 21].

The FDIC as Receiver opposes the Edwards' claims for summary judgment on jurisdictional grounds because they failed to submit their administrative claims to the FDIC prior to filing suit, thereby divesting this Court of subject-matter jurisdiction.  Moreover, the Edwards lack Article III standing. As to Placida's claim for repudiation damages, the FDIC as Receiver acknowledges that it is responsible for paying Placida for the "actual direct compensatory damages" it incurred, if any, for the repudiation of the construction loan, but the FDIC as Receiver disputes Placida's entitlement to a judgment of $1,632,000 as a matter of law based upon the appraisal report of Richard Bass, MAI, for the reasons set forth below.

## II.    ARGUMENT

### A.  **The Edwards are not entitled to summary judgment because this Court is divested of jurisdiction under FIRREA to adjudicate their claims.**

1.  Simultaneously herewith, the FDIC as Receiver has filed a motion to dismiss Count II of the Edwards' First Amended Complaint, since the Court lacks subject-matter jurisdiction to adjudicate their claims.  [Docket No. 42].

2.  The Edwards are not entitled to a judgment as a matter of law because they failed to exhaust their administrative remedies prior to the institution of these proceedings. [Docket No. 42, Exhibit 1, Declaration of Jeffry M. Quick, FDIC Claims Agent].

3.  The undisputed material facts identified in the plaintiffs' Motion for Summary Judgment demonstrate that only Placida has submitted an administrative claim to the FDIC, [Docket No.

38], even though § 1821(d)(13)(D) of FIRREA requires each claimant to submit its own claim before it can proceed with a lawsuit for repudiation damages against the FDIC as Receiver.

4.   The Edwards' responses to Interrogatory Number 3 further illustrate that they are attempting to bootstrap the administrative claim submitted by Placida as a way to comply with FIRREA's administrative scheme because they failed to submit their own administrative claims [See Docket No. 42, Exhibit 2, Notice of Filing Michael Edwards and Sheryl Edwards' Responses to Interrogatories ].

**B.   The Edwards are not entitled to summary judgment because they lack standing.**

5.   Moreover, the Edwards lack Article III standing, since the loan documents attached to plaintiffs' First Amended Complaint clearly demonstrate that they were simply guarantors of the Placida construction loan and there are no allegations in either the First Amended Complaint or the plaintiffs' Motion for Summary Judgment that they suffered any "actual direct compensatory damages" as of October 31, 2008, the date the FDIC as Receiver was appointed, as required by § 1821(e)(3)(A)-(B) of FIRREA. [Docket Nos. 21 and 38].

**C.   While Placida is entitled to summary judgment as to the issue of liability, it is not entitled to summary judgment as to the amount of repudiation damages.**

6.   The plaintiffs have identified eighteen paragraphs of undisputed material facts in their Motion for Summary Judgment, which they attempt to support through the Affidavit of Michael Edwards. [Docket No. 38].

7.   The FDIC as Receiver disputes paragraph 17 of the undisputed material facts where Michael Edwards states that Placida has been damaged in the amount of $1,632,000. [Affidavit of Michael Edwards, ¶ 21]. His affidavit is improper because Rule 56(e) of the Federal Rules of Civil Procedure only permits affidavits which "set forth such facts as would be admissible in evidence" and because Mr. Edwards is not an expert witness, he cannot introduce or act as a

conduit for inadmissible hearsay. Moreover, the appraisal opinions of Richard Bass, MAI, are inadmissible as evidence.

8.  Placida's attempt to obtain summary judgment on the issue of damages is inappropriate because the evidence bears on crucial issues of fact and is entirely based on expert opinion testimony. *See e.g. Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) (cert. denied, 404 U.S. 823 (1971) ("Summary judgment is often inappropriate where the evidence bearing on crucial issues of act is in the form of expert testimony." (citing *Sartor v. Arkansas Natural Gas Corp.* 321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944))).

9.  The FDIC as Receiver does not dispute it is liable for the payment of "actual direct compensatory damages" under FIRREA, but it does dispute the amount of damages claimed by Placida.

10.  Placida's damages are predicated entirely on the appraisal opinion of Richard Bass, MAI, [See Docket 39, ¶ 21] and his opinion of value is inadmissible as a matter of law as discussed in detail below.

11.  The FDIC as Receiver asserted three affirmative defenses to Count II of the Amended Complaint. [Docket No. 21].

12.   Independent of the appraisal issues discussed herein, the plaintiffs also are not entitled to a judgment as a matter of law on the issue of damages because they admit that FDIC as Receiver is entitled to a setoff, but fail to address the amount of the setoff.  [Docket No. 38, pg. 15, ¶ 45].

### D.  Mr. Bass' opinion of value of the "as if" completed value of the subject property is inadmissible as a matter of law under FIRREA.

13.  The Plaintiffs engaged Richard W. Bass, MAI, a Sarasota-based real estate appraiser, who completed a retrospective appraisal report regarding the subject property. Mr. Bass'

appraisal report sets forth his opinions of value in connection with the FDIC as Receiver's repudiation of the Placida construction loan. [See Docket No. 40, Notice of Filing Deposition Transcript of Richard Bass, MAI, with his appraisal report attached thereto].

14.   In his appraisal report, Mr. Bass opines that the Placida project was 70% complete as of October 31, 2008, the date the FDIC as Receiver was appointed as receiver for the former Freedom Bank. [Bass Appraisal, pgs. 9, 68].

15.   Pursuant to Rule 26(a)(2)(ii), Mr. Bass identified four opinions of value which he plans to testify to at trial. [Bass Appraisal, p. 81].

16.   One of his four opinions of value includes the "as if" completed value of the subject property, which he concluded was $3,400,000 as of October 31, 2008. [Bass Appraisal, pgs. 67, 81].

17.   Mr. Bass' opinion regarding the "as if" completed value of the subject property is exactly the type of damages that is not permitted by FIRREA and the supporting case law.

18.   Section 1821(e)(3)(A)(i) of FIRREA limits repudiation claims to "actual direct compensatory damages." While actual direct compensatory damages include those damages flowing directly from the repudiation,  § 1821(e)(3)(B)(ii) of FIRREA specifically precludes any damages for lost profits or opportunity.

19.   Mr. Bass' opinion of the "as if" completed value required him to make various assumptions to determine what the completed project would be worth on the date the receiver was appointed. These assumptions, however, are completely unrelated to the loss in funding and necessarily would include lost profits and opportunity, thereby rendering his opinion inadmissible as a matter of law under FIRREA.

**E.**   **The paired data analysis utilized by Mr. Bass for his 40% discount rate is misleading and unreliable and, therefore, lacks any evidentiary value.**

20.   Mr. Bass opined that the value of the subject property prior to the repudiation of the loan was $2.4 million. As a result of the repudiation, he determined that the subject property suffered a 68% loss in value. This 68% loss is comprised of a 40% loss in value based upon a paired data analysis and another 28% loss attributable to the purchase of the underlying mortgage. [Bass Appraisal, pgs. 72-80].

21.   Mr. Bass' opinion is unreliable, defies common sense, and should be rejected under section 702 of the Federal Rules of Evidence because under his analysis, not only do the three partially-completed office buildings lose all of their value, but the land would also lose $42,000 of its value due to the loss in funding of the construction loan.  [Bass Appraisal, p. 80].

22.   Mr. Bass' opinion of the 40% loss in value is predicated on a paired data or paired sales analysis. [Bass Appraisal, pgs. 71-80].

23.   At his deposition, Mr. Bass recognized that the treatise, *The Appraisal of Real Estate*, by the Appraisal Institute, of which he is a member, is an authoritative source on the subject of real estate appraising. [Bass Depo. pgs. 82-83].

24.   According to this treatise, "[p]aired data analysis is based upon the premise that when two properties are equivalent in all respects but one, the value of a single difference can be measured to indicate the difference in price between the two properties." *The Appraisal of Real Estate,* Appraisal Institute, 13th Edition, p. 316].

25.   The appraisal manual, however, goes on to provide the following cautionary statement concerning the applicability of this appraisal technique. "Although paired data analysis is a theoretically sound method, it may be impractical when only a narrow sampling of sufficiently similar properties is available. This is particularly true for commercial and industrial properties and properties that do not sell frequently in the market." A lack of data can make quantifying the

adjustments attributable to all the variables a difficult process. An adjustment derived from a single pair of sales is not necessarily indicative, just as a single sale does not necessarily reflect market value." *The Appraisal of Real Estate,* p. 317].

26.  Mr. Bass employed the paired data analysis by comparing three partially-completed office projects that resold to extract a percentage discount that in turn could be applied to the subject property to determine the resulting loss in value. [Bass Appraisal, pgs. 72-80].

27.  His paired data analysis is problematic, however, because it is readily apparent there are too many dissimilarities between all of the characteristics of the sales to isolate a percentage discount a prudent purchaser would expect to receive for buying a partially-completed office project.

28.  Moreover, Mr. Bass made absolutely no quantitative or qualitative adjustments to any of the three sales to account for any of the dissimilarities. [Bass Depo. p. 60, Line 25 –p. 61, lines 1-4, Bass Appraisal, pg. 80].

29.  According to Mr. Bass, two out of his three "comparable" sales demonstrated a 40% percentage discount, while the remaining sale showed a percentage discount of 51%.  [Bass Appraisal, p. 80]. In reviewing these sales, he concluded that a 40% discount should be applied to the subject property. [Bass Appraisal, p. 80].

30.  Mr. Bass' three sales are too remote in time to have any evidentiary value because the sales took place in January, March, and April of 2010, even though the date of value here is October 31, 2008. [Bass Appraisal, pgs. 72-79].

31.  In fact, Mr. Bass' own deposition testimony contradicts his opinion on this issue because he admitted that the appropriate time parameter for using comparable sales after the date of value would be 6 months or less. [Bass Depo. p. 47, line 15 through p. 48, line 14].

32.   In addition, all three of Mr. Bass' paired sales cannot be fairly said to be comparable to the subject property because they are not even located in Charlotte County like the subject property. Instead, his sales are located a substantial distance away in Hendry, Hillsborough, and Collier counties, all of which have substantially different economic conditions than Charlotte County. [Bass Appraisal, Pgs. 72-80].

33.   Beyond the dissimilarities in time and location, there are also other substantial differences in size which would undermine the ability to isolate the discount for purchasing a partially-completed office project. Specifically, the subject property consists of 67,383 square feet, while one of the paired sales is almost double the size (130,838 s.f.) and another is less than half the size (29,808 s.f.). [Bass Appraisal, pgs. 72-78].

34.   Also, comparable sale #3 was less complete when compared to the subject property which would overestimate the amount of damages. [Bass Appraisal, p. 78].

35.   At his deposition, Mr. Bass attempts to explain away his reasons for selecting the three out-of-county sales and then making no adjustments to them by arguing that the sales were not used for direct-comparison purposes. [Bass Depo. p. 59, line 4- p. 60, line 21]. That distinction, however, is one without a difference, since Mr. Bass ultimately applies the percentage discount directly to the subject property. [Bass Appraisal, p. 80-81].

36.   The failure of Mr. Bass to adjust his sales based upon the substantial differences when compared to the subject property is contrary to accepted appraisal methodology and renders his conclusion of value misleading, unreliable, and thereby devoid of any evidentiary value.

37.   Mr. Bass also attempts to justify the use of his unadjusted paired sales by the lack of available data.  [Bass Depo, p. 53, lines 24-25, p. 54, lines 1-3]. The scarcity of data, however, has never been a license for an expert to render an opinion based upon insufficient evidence.

Here, Mr. Bass' application of the 40% discount is based upon the use of only two sales, which results in a lack of sufficient data to isolate the amount of a percentage discount a willing buyer would pay for an incomplete office project similar to the subject property.

38.    While real-estate appraisers have a fair amount of discretion in selecting comparable sales, their selection of sales is not unbridled and the proposed evidence is still subject to legal constraints in order to support a proper evidentiary foundation under Fed. R. Evid. 702.

39.    Mr. Bass' paired sales are inadmissible as a matter of law because they lack any evidentiary value to demonstrate that the discount rate attributable to the loss in funding can be extracted from the three sales he relied upon given the number of differences between the properties.

**F.    Damages associated with the purchase of the mortgage do not constitute actual direct compensatory damages under FIRREA.**

40.    On top of the 40% loss in value for the three out-of-county sales, Mr. Bass improperly adds another 28% loss in value attributable to "the purchase of the underlying mortgage" to conclude a total loss in value of 68%. [Bass Appraisal, p. 80].

41.    Placida's claim for damages associated with the purchase of the underlying mortgage never was submitted to the FDIC as Receiver as part of the administrative claim process and therefore cannot be considered by the Court. [Docket No. 39-2]; *Ravenswood v. FDIC as Receiver for Bank of Lincolnwood*, 2011 WL 1079495 (N.D. Ill.) (Mar. 21, 2011).

42.    Mr. Bass' appraisal opinion is this regard is premised upon a misconception of law. FIRREA's "actual direct compensatory damages" limitation does not include this type of damage because it does not flow directly from the repudiation of the construction loan.  The only issue is the loss in market value attributable to the loss in funding, not the cost of purchasing the mortgage.

43.   Mr. Bass' answers to the following questions during his deposition illustrates that his opinion regarding this additional 28% in damages is not attributable to the loss of funding of the loan, but instead is related to the purchase of the mortgage.

Q. And then in addition to that, you concluded to a 40 percent diminution in value based on those three comparable sales?

A. Yes.

Q. And then on top of that, you determined that another 28 percent was appropriate, correct?

A. Yes.

Q. Can you explain to me the basis for that opinion?

A. Yep. I think I wrote it out here for you.

As we looked at those particular three that we just discussed, we were able to identify a document that discount was applied. What we were not able to verify and document specifically for each of those is what that mortgage sold for.

So bank A sells the mortgage on -- let's just pick a property -- for 20 cents on the dollar. We can't verify that. That is not public domain information. We have a range of what that discount is.

That is Mission Capital, for example. It says if those discounts we form off those mortgages, you know, we are getting from 20 to 60 percent discount and sometimes even higher. So while we've got confirmation of the subsequent sale of the property and what that discount was, we don't have the original discount from the bank to the wholesaler who is buying that mortgage. And that guy is turning around and selling it. This is the sale we have. We don't have this discount. But we know that range is 20 to 60 percent or higher. We have confirmed that information. So what do I apply out of that range? I can apply 20 percent or I can apply 60 percent. Well, if I apply 60 percent, plus the 40 percent discount, that is 100 percent. That is not logical. You can't do that. So it has got to be something else. Then you sit back and go, all right, within this project what is reasonable, what is logical in order to apply an appropriate discount. I got the support for 20/60. Where am I going to pick in that number? You want to pick in that number with what is consistent with what the ultimate analysis we've done here. That works out to about 28 percent.

[Bass Depo. pgs. 78-79].

In addition to being precluded by FIRREA, Mr. Bass' 28% damage calculation also is speculative because it is not based upon market evidence, and it is not compensatory because the diminution in value already was included in the loss incurred.

### G. Mr. Bass' opinion concerning the loss in value of the land due to the loss in funding is unreliable and defies common sense.

44.  According to Mr. Bass, the subject property had a land value of $810,000 as of October 31, 2008. [Bass Appraisal, p. 45].

45.  Mr. Bass concludes that as a result of the repudiation of the loan, the subject property lost 68% of its overall value, resulting in an after-repudiation land value of $768,000.

46.  It defies common sense that not only would the three office buildings comprising 17,600 square feet lose all of their value, but that the land somehow would lose $42,000 of its value as a result of the repudiation of the construction loan.

47.  While downward market conditions could account for a loss in value of the land, it cannot fairly be said that the repudiation of the loan impacted the value of the land for the subject property. Accordingly, Mr. Bass' opinion on this issue is not market driven, but instead based upon speculative and misleading data which is unreliable and defies common sense. Accordingly, the Court as the gatekeeper of evidence should preclude Mr. Bass from being able to testify to his opinion.

## III.  MEMORANDUM OF LAW

### A. The Requirements of Article III Standing

A federal court has the power to hear only those cases over which it has been granted subject-matter jurisdiction by Article III, Section 2, of the United States Constitution. Article III provides that the judicial power extends over "cases" and "controversies." U.S. Const. Art. III, § 2; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559-60, 112 S.Ct. 2130, 119 L.Ed.2d 351

(1992). The United States Supreme Court has interpreted this language as requiring, among other

things, that the parties bringing suit in federal court have standing to do so. *Id.* at 560. As the

Supreme Court explained:

> Over the years, our cases have established that the irreducible constitutional
> minimum of standing contains three elements. First, the plaintiff must have
> suffered an "injury in fact"-an invasion of a legally protected interest which is (a)
> concrete and particularized ...; and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical,' " .... Second, there must be a causal connection between the injury
> and the conduct complained of-the injury has to be "fairly ... trace[able] to the
> challenged action of the defendant, and not ... th[e] result [of] the independent
> action of some third party not before the court." ... Third, it must be "likely," as
> opposed to merely "speculative," that the injury will be "redressed by a favorable
> decision."

*Id.* at 560-61 (internal citations and footnote omitted). Furthermore, "[t]he party invoking federal

jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Beyond the constitutional requirements, the federal judiciary also adheres to a set of

prudential principles that bear on the question of standing. This Court has held that "the plaintiff

generally must assert his own legal rights and interests, and cannot rest his claim to relief on the

legal rights or interests of third parties...." In addition, even when the plaintiff has alleged

redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from

adjudicating "abstract questions of wide public significance" which amount to "generalized

grievances," pervasively shared and most appropriately addressed in the representative

branches.... Finally, the Court has required that the plaintiff's complaint fall within "the zone of

interests to be protected or regulated by the statute or constitutional guarantee in question."

*Jackson v, Guardian Life Insurance*, 2008 WL 2439796 (M.D.Fla. 2008) (citing *Valley Forge*

*Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474-75, 102

S.Ct. 752, 70 L.Ed.2d 700 (1982) (internal citations and footnotes omitted)).

Article III limits the jurisdiction of the federal courts to actual "cases" and

"controversies." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). A party has standing within the meaning of Article III when it establishes three elements: (1) injury, (2) causation, and (3) redressability. *Defenders of Wildlife,* 504 U.S. at 560-61.. The injury must be an injury in fact, i.e., the invasion of a legally-protected interest which is concrete and particularized, not conjectural or hypothetical. *Id.* at 560. "Moreover, there must be some causal connection between the asserted injury and the challenged action, and the injury must be of the type likely to be redressed by a favorable decision." *Gutherman v. 7-Eleven, Inc.*, 278 F.Supp.2d 1374,1378 (S.D. Fla. 2003) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)).

Because the Edwards failed to allege that they suffered any actual direct compensatory damages at the time the FDIC as Receiver was appointed, they lack Article III standing.

## B. The Administrative Claims Process under FIRREA

In FIRREA, Congress enacted a comprehensive statutory scheme granting the FDIC authority to act as receiver for a failed financial institution and special powers to carry out that function. *See* 12 U.S.C. §§ 1821(c)-(d). When the FDIC is appointed as receiver, it succeeds to "all rights, titles, powers, and privileges" of the failed depository institution, 12 U.S.C. § 1821(d)(2)(A)(i), and may "take over the assets of and operate" the failed institution with all the powers thereof. 12 U.S.C. § 1821(d)(2)(B)(i). The FDIC, as receiver, must conserve and preserve the failed institution's assets, liquidate those assets when appropriate, and use the proceeds of liquidation to make distributions among the institution's valid creditors. *See* 12 U.S.C. §§ 1821(d)(2)(B)&(E). Congress also has given the receiver discretion to determine the timing and amount of such distributions. *See* 12 U.S.C. §§ 1821(d)(10)(A)&(B). The receiver's powers are "quite broad, in keeping with the emergent

objectives of the statute." *Rosa v. RTC,* 938 F.2d 383, 398 (3d Cir. 1991).

FIRREA also creates an administrative procedure for adjudicating claims asserted against an institution in receivership. 12 U.S.C. § 1821(d)(3)(B)(i) directs the receiver to provide prompt notice by publication to the failed institution's creditors or potential claimants informing them that they have ninety days from the date of published notice to present their claims against the institution. Once such a claim is presented, the FDIC has 180 days to notify the creditor or claimant of the determination of the claim. *See* 12 U.S.C. § 1821(d)(5)(A). The FIRREA administrative claims process is mandatory; thus, until such time as the claim is disallowed by the FDIC, "no court shall have jurisdiction over [] any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver." 12 U.S.C. § 1821 (d)(13)(D)(i). Further, pursuant to 12 U.S.C. § 1821(d)(6)(B)(ii), if a party fails to comply with the statutory time limitations, any claim that the party has "shall be deemed to be disallowed. . . as of the end of such period, such disallowance shall be final, and the claimant shall have no further rights or remedies with respect to such claim."

Numerous courts across the nation, including the Eleventh Circuit, uniformly have held that courts are divested of jurisdiction where the administrative claims process has not been complied with. *McMillian v. FDIC,* 81 F.3d 1041, 1045 (11th Cir. 1996) ("FIRREA makes exhaustion of the FDIC's administrative complaint review process mandatory when the FDIC has been appointed receiver for a financial institution."); *see also Am. First Fed.* v. *Lake Forest Park,* 198 F.3d 1259, 1263 (11th Cir. 1999) ("the plain language of [§ 1821(d)(13)(D)] thus divests the district court of jurisdiction over requests for relief," including

"actions seeking a determination of rights with respect to assets of a failed bank" and "any claim relating to any act or omission of such institution or the RTC as receiver."); *FDIC* v. *Lacentra Trucking,* 157 F.3d 1292, 1294 (11th Cir. 1998); *Aguilar* v. *FDIC,* 63 F.3d 1059, 1061 (11th Cir. 1995) (per curiam) (recognizing that FIRREA's administrative exhaustion requirement applies generally to all claims against an institution in federal receivership); *Village of Oakwood v. State Bank and Trust Co.,,* 539 F.3d 373, 385 (6th Cir. 2008) (depositors' failure to file timely administrative claim barred them from seeking relief in federal court); *FDIC v. Kane*, 148 F.3d 36 (1st Cir. 1998) (failure to submit a claim that accrued prior to the bar date to the administrative claims review process bars court action); *RTC Mortg. Trust 1994-/V2 v. Haith,* 133 F.3d 574, 580 (8th Cir. 1998) (claims that "had their genesis in pre-receivership conduct" must be denied if not asserted by the claims bar date); *Intercontinental Travel Mktg, Inc. v. F.D.l.C,* 45 F.3d 1278, 1284 (9th Cir. 1994) (exhaustion requirement becomes a jurisdictional bar when "a claimant fails to file a timely administrative claim"); *Brewer v. Indymac Bank,* No 2:08-CV-01211-FCD-DAD, 2009 WL 2915052 (E.D. Cal. Sept. 9, 2009) (dismissing case for lack of subject-matter jurisdiction where Plaintiff failed to submit evidence that claim was timely filed by claims bar date); *Sapp* v. *FDIC,* 876 F.Supp. 249 (D.Kan. 1995) (dismissing plaintiffs' claims for failure to file a timely administrative claim with the FDIC pursuant to FIRREA).

C. **The Edwards failed to exhaust their administrative remedies as mandated by FIRREA.**

The Edwards failed to submit their administrative claim to the FDIC prior to commencing the instant lawsuit [*See* Declaration of Jeffry M. Quick, FDIC Claims Agent] and, therefore, this Court is divested of jurisdiction to award the relief sought in their motion for summary judgment. Although the FDIC as Receiver acknowledges that Placida timely submitted

its administrative claim, it does not excuse the Edwards from failing to submit their claims. Under FIRREA, administrative exhaustion is required by each claimant before any court acquires subject-matter jurisdiction over claims against FDIC as receiver for a failed institution. Federal Deposit Insurance Act, § 2[11](d)(6)(A), (d)(13)(D), as amended, 12 U.S.C.A. § 1821(d)(6)(A), (d)(13)(D).

Because the Edwards failed to exhaust their administrative remedies by the February 24, 2009 Bar Date that the FDIC established and published in accordance with FIRREA's statutory requirements, the Edwards are precluded from forever pursuing their claims based on any of Freedom Bank's pre-receivership acts or omissions.

### D. **Actual Direct Compensatory Damages under FIRREA.**

Subsection 1821(d) of FIRREA outlines the powers and duties of the FDIC as receiver, authorizing the agency to, inter alia, determine and pay claims against the financial institution in accordance with the subsection's requirements. Subsections 1821(d)(3)-(6) set forth the procedures for the determination of claims, and Section 1821(d)(11) establishes a distribution priority for claims to the financial institution's assets.

Subsection 1821(e) of FIRREA authorizes the FDIC, as receiver, to repudiate any contract of the insolvent financial institution it deems burdensome, so long as the repudiation of the contract will promote the orderly administration of the financial institution's affairs, 12 U.S.C. § 1821(e)(1), and the repudiation is made within a reasonable time of the receiver's appointment, 12 U.S.C. § 1821(e)(2). Repudiation gives rise to an ordinary contract claim for damages. *See Howell v. FDIC,* 986 F.2d 569, 571 (1st Cir. 1993). FIRREA expressly limits the damages that may be assessed by courts for the FDIC's repudiation of a contract:

Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the

liability of the conservator or receiver for the disaffirmance or repudiation of any contract

pursuant to paragraph (1) shall be-

> (i) limited to actual direct compensatory damages; and

> (ii) determined as of—

>> (I) the date of the appointment of the conservator or receiver; or

>> (II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

12 U.S.C. § 1821(e)(3)(A).

Pursuant to FIRREA, "actual direct compensatory damages" are limited and do not include punitive or exemplary damages, damages for lost profit or opportunity, or damages for pain and suffering. 12 U.S.C §§ 1821(e)(3)(A)-(B). "Actual direct compensatory damages" are determined as of the date the receiver is appointed. 12 U.S.C. § 1821(e)(3)(A)(ii).

"'[A]ctual direct compensatory damages' appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation." *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir. 1996).

Both the First Amended Complaint and the Motion for Summary Judgment are devoid of any allegations that the Edwards suffered any "actual direct compensatory damages" in this case. [See Docket Nos. 21 and 38]. Moreover, the sworn responses by the Edwards to the FDIC as Receiver's First Set of Interrogatories also confirm that they have not suffered any "actual direct compensatory damages" because they rely solely upon the administrative claim submitted by Placida. [See Notice of Filing Edwards' Responses to Interrogatory 3]. Accordingly, the Edwards' claims should be dismissed.

**E. Mr. Bass' opinions are precluded by FIRREA.**

The plaintiffs here are seeking to present evidence in violation of FIRREA's explicit actual, direct, compensatory damages limitation by demonstrating what the subject property would be worth on the date the receiver was appointed. This proposed evidence is unrelated to the loss in funding and necessarily would include loss profits and opportunity. The court in *F.D.I.C. v. Parkway Executive Office Ctr.*, 1998 WL 18204 (E.D.Pa. 1998) recognized that evidence that assumes what property *would have been worth* goes beyond the actual direct compensatory damages allowed by FIRREA. The court in *Parkway* stated:

> Defendants are not seeking to present evidence of the difference between what the building would have been worth had the construction job been completed and what the building was worth on the day the RTC repudiated. Such damages would "go farther by including future contingencies such as lost profits and opportunities." *Id.* This is not the scenario here. Defendants here simply seek to prove the difference between the value of the building at Five Logan Square with the funding in place "as of" the date the Receiver was appointed, and the value of the building after the repudiation with no such funding in place.

*Parkway* at *5.

Mr. Bass' inclusion of an additional 28% in damages attributable to the purchase of the underlying mortgage is not compensable as a matter of law based upon FIRREA's actual direct compensatory damages limitation because the damages attributable to the purchase of the mortgage are not directly related to the loss in funding of the construction loan.

### F. The Court's role as gatekeeper of admissible evidence.

The district courts stand in the role of "gatekeeper" in screening evidence. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786 (1993). *See also General Electric*

*Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512 (1997) (stating "while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye,* they leave in place the "gatekeeper" role of the trial judge in screening such evidence."); *U.S. v. Frazier,* 387 F.2d 1244, 1260 (11th Cir. 2004), cert. denied 544 U.S. 1063, 125 S.Ct. 2516, 161 L.Ed.2d 1114 (2005) ("Rule 702 compels the district court to perform this critical 'gatekeeping' function concerning the admissibility of expert scientific evidence.").

Federal Rule of Evidence 702 provides in relevant part that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

All three requirements of the above rule were not met here. Mr. Bass' opinions concerning the "as if" completed value of the subject property and the 28% damage calculation are based upon his misconception of the type of damages permitted by FIRREA. *See Mulkey v. Div. of Admin, State of Florida Dept. of Transp.,* 448 So. 2d 1062 (Fla. Dist. Ct. App. 1984) (appraiser's opinion cannot be based upon misconception of law). In addition, he selected three paired sales that are not comparable to the subject property, and he failed to make any adjustments to his sales before concluding a 40% diminution in value of the subject property.

## CONCLUSION

Based on the foregoing authorities, the Court should deny the Edwards' Motion for Summary Judgment based on lack of subject-matter jurisdiction, deny Placida's Motion for

Summary Judgment as to the amount of damages, and award costs and such other relief the Court deems justified.

Respectfully submitted,

By:   /s/ Michael H. Rosen, Esq.
DAVID J. TONG, ESQ.
Florida Bar No. 437085
dtong@saxongilmore.com
MICHAEL H. ROSEN, ESQ.
Florida Bar No. 710393
mrosen@saxongilmore.com
**SAXON, GILMORE, CARRAWAY,
& GIBBONS, P.A.**
201 East Kennedy Boulevard, Suite 600
Tampa, Florida 33602
Phone: (813) 314-4500
Fax: (813) 314-4555
Attorneys for Federal Deposit Insurance
Corporation as Receiver for Freedom Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 4, 2011, I presented Defendant, FDIC as Receiver's Response in Opposition to Plaintiffs' Motion for Summary Judgment, and Incorporated Memorandum of Law in Support Thereof, to the Clerk of the United States District Court, Middle District of Florida, Tampa Division, for filing and uploading to the CM/ECF system, which will send a Notice of Electronic Filing to: Sheryl A. Edwards, The Edwards Law Firm, PL, 1901 Morrill Street, Sarasota, FL 34236.

/s/ Michael H. Rosen, Esq.
ATTORNEY