**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**PLACIDA PROFESSIONAL CENTER, LLC, a Florida Limited Liability Company, MICHAEL B. EDWARDS and SHERYL A. EDWARDS,**

**Plaintiffs,**

**v.** **CASE NO. 8:2009 CV 02221-T30 MAP**

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Freedom Bank,**

**Defendant.**

_______________________________________/

**DEFENDANT'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF PLACIDA PROFESSIONAL CENTER, LLC'S CLAIM FOR REPUDIATION DAMAGES**

Defendant, FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FREEDOM BANK ("FDIC as Receiver"), pursuant to Rule 56, Federal Rules of Civil Procedure, and Local Rule 3.01 for the Middle District Court of Florida, hereby moves for Partial Summary Judgment as to Count II of the First Amended Complaint [Docket No. 21] against Plaintiff, PLACIDA PROFESSIONAL CENTER, LLC, a Florida Limited Liability Company ("Placida").

The FDIC as Receiver shows that there are no genuine issues of material fact and that it is entitled to partial summary judgment as a matter of law on Count II of Placida's First Amended Complaint for damages.

## I. INTRODUCTION

This case arises out of the FDIC as Receiver's disallowance of Placida's administrative claim for repudiation damages pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). The FDIC as Receiver exercised its right under FIRREA to repudiate the continued funding of Placida's construction loan because the continued performance would be "burdensome," and the repudiation would "promote the orderly administration of the failed institution's affairs." [Docket No. 21].

Placida's claim for repudiation damages is predicated upon the appraisal opinions of Richard Bass, MAI. [Docket Nos. 38, 40]. Because the material facts are not in dispute and Mr. Bass' appraisal opinions are inadmissible as a matter of law, the FDIC as Receiver is entitled to partial summary judgment as to Count II of Placida's First Amended Complaint for repudiation damages.

## II. THE UNDISPUTED MATERIAL FACTS UPON WHICH PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED

1. Placida is a Florida Limited Liability Company whose principal place of business is located in Sarasota, Florida. [*See* Affidavit of Michael Edwards at ¶ 1].

2. Freedom Bank was a federally-insured banking institution whose principal place of business was located in Bradenton, Florida. On October 31, 2008, Freedom Bank was closed and the FDIC as Receiver was appointed as the receiver to wind up the affairs of Freedom Bank. [*See* Affidavit of Michael Edwards at ¶ 9].

3. On or about February 28, 2007, Placida executed a Construction Loan Agreement, ("Construction Loan Agreement"), Promissory Note ("Note"), and Mortgage ("Mortgage"), as well as other documents (collectively referred to as "the Loan"), whereby Freedom Bank committed to lend the sum of $3,280,000 to Placida to construct a 17,600 square foot

professional office center in Charlotte County, Florida ("the Placida Project"). The legal description of the Placida Project is as follows:

> Block 105, GROVE CITY SUBDIVISION, according to the plat thereof recorded in Plat Book 1, Page 4, of the Public Records of Charlotte County, Florida, together with vacated 15-foot alley described in Official Records Book 1844, Page 1557, and less state road right-of-way.

("the Placida Property"). [*See* Affidavit of Michael Edwards at ¶ 2 and Exhibit A thereto.]

4. Pursuant to the Construction Loan Agreement, Placida was to construct the Placida Project pursuant to a Construction Loan Budget submitted to and approved by Freedom Bank. [*See* Affidavit of Michael Edwards at ¶ 3].

5. Pursuant to the Construction Loan Agreement, $240,000.00 of the principal amount of the Loan was to be reserved for interest payments on the Loan during construction. [*See* Affidavit of Michael Edwards at ¶ 3].

6. On or about March 27, 2007, Placida and its general contractor, Fred Shute Real Estate and Development, Inc. ("General Contractor"), executed a Construction Agreement for the construction of the improvements on the Placida Property ("the Construction Contract"). [*See* Affidavit of Michael Edwards at ¶ 4].

7. From July 27, 2007 to October 15, 2008, construction proceeded according to schedule with monthly draw requests submitted at the end of each month. A total of twelve draw requests were received, reviewed, and paid by Freedom Bank with disbursements made from the Loan in the total amount of $1,597,504.20 as of October 30, 2008. [*See* Affidavit of Michael Edwards at ¶ 5].

8. During construction, interest-only payments were made on the 28th day of each month by Freedom Bank drawing the same from the Interest Reserve. As such, the monthly interest

payment due on October 28, 2008 was paid from the Interest Reserve on or about October 30, 2008. [*See* Affidavit of Michael Edwards at ¶ 6].

9. After payment of the October 30, 2008 interest payment, the next monthly interest payment would not be due until November 28, 2008. [*See* Affidavit of Michael Edwards at ¶ 7].

10. After payment of the October 30, 2008 interest payment, the sum of $1,682,495.68 remained in the Construction account. [*See* Affidavit of Michael Edwards at ¶ 8].

11. The FDIC as Receiver was appointed as receiver for Freedom Bank on Friday, October 31, 2008. On that date, the Placida Project was approximately 3-4 weeks from completion of construction. [*See* Affidavit of Michael Edwards at ¶ 9].

12. On or about November 6, 2008, the FDIC as Receiver notified Placida that it was exercising its right of repudiation of the Loan pursuant to 12 U.S.C. § 1821(e), citing that the continued performance thereof by the FDIC as Receiver would be "burdensome" and repudiation would "promote the orderly administration of the failed institutions' affairs." [*See* Affidavit of Michael Edwards at ¶ 10].

13. On Friday, October 31, 2008, the date of the appointment of FDIC as Receiver for Freedom Bank, and on November 6, 2008, the date of FDIC as Receiver's repudiation of the Loan, the Loan was in good standing in all respects and was not in default. [*See* Affidavit of Michael Edwards at ¶ 11].

14. On or about February 3, 2009, Placida submitted a timely claim to the FDIC as Receiver for damages caused by the FDIC as Receiver's repudiation of the Construction Loan Agreement. The FDIC as Receiver received Placida's claim on February 4, 2009. [*See* Affidavit of Michael Edwards at ¶ 15 and Exhibit C thereto].

15. On or about July 30, 2009, the FDIC as Receiver sent Placida notice of its intent to extend the 180-day claims period, pursuant to 12 U.S.C. 1821(d)(5)(A)(ii), which was agreed to by Placida on August 3, 2009. [*See* Affidavit of Michael Edwards at ¶ 17 and Exhibit D thereto].

16. On or about September 1, 2009, and again on September 18, 2009, the FDIC as Receiver notified Placida that it denied Placida's claim. [*See* Affidavit of Michael Edwards at ¶ 18].

17. Placida engaged Richard W. Bass, MAI, a Sarasota-based real estate appraiser, who completed a retrospective appraisal report regarding the Placida Project. Bass' appraisal report sets forth his opinions of value in connection with the FDIC as Receiver's repudiation of the Placida Construction Loan Agreement. [*See* Docket No. 40, Notice of Filing Deposition Transcript of Richard Bass, MAI, with his appraisal report attached thereto].

18. In his appraisal report, Bass opines that the Placida Project was 70% complete as of October 31, 2008, the date the FDIC as Receiver was appointed as receiver for the former Freedom Bank. [*See* Bass Appraisal, pgs. 9, 68].

19. Pursuant to Rule 26(a)(2)(ii), Bass identified four opinions of value that he plans to testify to at trial. [Bass Appraisal, p. 81].

20. One of his four opinions of value includes the "as if" completed value of the Placida Project, which Bass concluded was $3,400,000 as of October 31, 2008. [*See* Bass Appraisal, pgs.67, 81].

21. Bass concluded that the total damages due to Placida as of October 31, 2008 were $1,632,000. [*See* Bass Appraisal, p. 81].

22. Bass' damage calculation of $1,632,000 for the Placida Project is based upon a 68% loss in value, of which 28% is attributable to the purchase of the underlying Mortgage. [*See* Bass Appraisal p. 80].

23. According to Bass, the land value of the Placida Project as of October 31, 2008, prior to the FDIC as Receiver's repudiation of the Placida Construction Loan Agreement, was $810,000. [*See* Bass Appraisal, p. 45].

24. According to Bass, the value of the Placida Project as of October 31, 2008, as a result of the FDIC as Receiver's repudiation of the Placida Construction Loan Agreement, was reduced to $768,000. [*See* Bass Appraisal, p. 80].

25. On October 30, 2009, Placida filed this action for declaratory relief, repudiation damages and setoff against the FDIC as Receiver, and filed a lis pendens in the public records of Charlotte County, Florida against the Placida Property. [*See* Affidavit of Michael Edwards at ¶ 19].

## III. ARGUMENT AND MEMORANDUM OF LAW

### A. Summary Judgment Standard.

Summary judgment is appropriate when the movant can demonstrate that the pleadings, depositions, affidavits, and other evidence available to the court establish no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265, (1986). Once the movant has met its burden, the nonmovant must demonstrate that there are fact issues warranting a trial. Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving party may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient evidence supporting a claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

If the nonmovant fails to make a showing on an element for which he bears the burden of proof, the movant is entitled to judgment as a matter of law. *See Celotex Corp.*, 447 U.S. at 323. The evidence must be viewed in a light most favorable to the nonmovant, *Id*, and the focus of

this Court is upon disputes over material facts which might affect the outcome of the lawsuit.. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. , 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.1987), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987), and the cases cited therein.

In *Anderson*, the Supreme Court stated the trial court must consider the substantive burden of proof imposed on the party making the claim. 447 U.S. at 253. *Anderson* requires this Court to substantively evaluate the evidence offered by the moving and non-moving party to determine whether the evidence raises a "material" fact question that is "genuine." The Court in *Anderson* defined "material" as involving a "dispute[] over facts that might affect the outcome of the suit under the governing law…." 447 U.S. at 248.

If the evidence advanced by the nonmoving party "is merely colorable. . . or is not significantly probative. . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 447 U.S. at 252).

**B. FIRREA Limits Repudiation Damages to Actual Direct Compensatory Damages.**

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183, 187, permits the receiver of a failed financial institution to repudiate any lease or contract that the receiver finds to be burdensome. *See* 12 U.S.C. § 1821(e)(1). In pertinent part, FIRREA provides as follows:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

*Id*. Repudiation pursuant to the statute is treated as a breach of contract giving rise to an ordinary contract claim for damages. *See Howell v. FDIC,* 986 F.2d 569, 571 (1st Cir.1993). The following provisions of FIRREA, however, expressly limit the damages that may be assessed by courts for the FDIC's repudiation of a contract:

Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be-

(i) limited to actual direct compensatory damages; and

(ii) determined as of-

(I) the date of the appointment of the conservator or receiver; or

(II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

12 U.S.C. § 1821(e)(3)(A).

FIRREA limits the damages that can be recoverable as a result of a repudiated contract to "actual direct compensatory damages," determined as of the date of the appointment of the conservator or receiver. *Id.* Although the statute does not define the term "actual direct compensatory damages," it does expressly exempt recovery of: 1) punitive or exemplary damages; 2) damages for lost profits or opportunity; and 3) damages for pain and suffering. 12

U.S.C. § 1821(e)(3)(B).

Courts have consistently interpreted these provisions against the background of Congress' evident purpose, which was " 'to spread the pain,' in a situation where the assets are unlikely to cover all claims," and thus maximize the number of creditors who can recover some portion of what they are owed. *DPJ Co., Ltd. v. FDIC*, 30 F.3d 247, 248 (1st Cir. 1994); *see also Nashville Lodging Co., v. RTC*, 59 F.3d 236, 241 (D.C. Cir. 1995). It is also likely that Congress was concerned that the government's liability to the insured depositors of a failed bank would be increased if the bank's assets were depleted to pay off contract-claim creditors, thus providing a another reason to pare back damages claims founded on repudiated contracts. *Howell v. FDIC*, 986 F.2d 569, 570 (1st Cir. 1993). In keeping with that legislative intent, courts have limited recovery on such claims to actual out-of-pocket losses. *See e.g. Howell,* 986 F.2d 569 (1st Cir.1993) (holding that bank officers could not recover severance pay under repudiated agreement); *FDIC v. Cobblestone,* 1992 WL 333961 (D.Mass. 1992) (no recovery for diminution in going concern value of company as a result of loss of a line of credit repudiated by receiver).

"'[A]ctual direct compensatory damages' appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation." *McMillian v. F.D.I.C.*, 81 F.3d 1041, 1055 (11th Cir. 1996).

**C. <u>Mr. Bass' Appraisal Opinions Are Inadmissible as a Matter of Law.</u>**

Placida is seeking to present evidence in violation of FIRREA's explicit actual direct compensatory damages limitation by demonstrating what the Placida Project would have been worth as if it had been completed on the date the receiver was appointed. This opinion of value, however, is completely unrelated to the loss in funding because it would necessarily include lost

profits and opportunity. The court in *F.D.I.C. v. Parkway Executive Office Center,* 1998 WL 18204 (E.D.Pa. 1998) recognized that evidence that assumes what property would have been worth goes beyond the actual direct compensatory damages allowed by FIRREA. The court in *Parkway* stated:

> Defendants are not seeking to present evidence of the difference between what the building would have been worth had the construction job been completed and what the building was worth on the day the RTC repudiated. Such damages would "go farther by including future contingencies such as lost profits and opportunities." *Id.* This is not the scenario here. Defendants here simply seek to prove the difference between the value of the building at Five Logan Square with the funding in place "as of" the date the Receiver was appointed, and the value of the building after the repudiation with no such funding in place.

*Parkway* at *5. Accordingly, Mr. Bass' opinion of the "as if" completed value and any opinions derived from that value are inadmissible as a matter of law.

Mr. Bass concluded that the Placida Project lost 28% of its value associated with the "purchase of the underlying mortgage." [Bass Appraisal, p. 80]. This opinion is likewise inadmissible as a matter of law under FIRREA's actual direct compensatory damage limitation. Mr. Bass' answers to the following questions during his deposition illustrates that his opinion regarding this additional 28% in damages is not attributable to the loss of funding of the loan, but instead is related to the purchase of the Mortgage.

> Q. And then in addition to that, you concluded to a 40 percent diminution in value based on those three comparable sales?
>
> A. Yes.

> Q. And then on top of that, you determined that another 28 percent was appropriate, correct?
>
> A. Yes.
>
> Q. Can you explain to me the basis for that opinion?
>
> A. Yep. I think I wrote it out here for you.
>
> As we looked at those particular three that we just discussed, we were able to identify a document that discount was applied. What we were not able to verify and document specifically for each of those is what that mortgage sold for.
>
> So bank A sells the mortgage on -- let's just pick a property -- for 20 cents on the dollar. We can't verify that. That is not public domain information. We have a range of what that discount is.
>
> That is Mission Capital, for example. It says if those discounts we form off those mortgages, you know, we are getting from 20 to 60 percent discount and sometimes even higher. So while we've got confirmation of the subsequent sale of the property and what that discount was, we don't have the original discount from the bank to the wholesaler who is buying that mortgage. And that guy is turning around and selling it. This is the sale we have. We don't have this discount. But we know that range is 20 to 60 percent or higher. We have confirmed that information. So what do I apply out of that range? I can apply 20 percent or I can apply 60 percent. Well, if I apply 60 percent, plus the 40 percent discount, that is 100 percent. That is not logical. You can't do that. So it has got to be something else. Then you sit back and go, all right, within this project what is reasonable, what is logical in order to apply an appropriate discount. I got the support for 20/60. Where am I going to pick in that number? You want to pick in that number with what is consistent with what the ultimate analysis we've done here. That works out to about 28 percent. [Bass Depo. pgs. 77-79].

In addition to being precluded by FIRREA, Bass' 28% damage calculation also is speculative because it is not based upon market evidence, and it is not compensatory because the diminution in value was already included in the loss incurred.

**D. <u>The Paired Data Analysis Used by Bass for His 40% Discount Rate is Misleading and Unreliable and, Therefore, Lacks Any Evidentiary Value.</u>**

Bass attempts to appraise the diminution in value of the subject property attributable to the loss in funding by conducting a paired data or paired sales analysis. Based upon his paired

data analysis, Bass opined that the Placida Project lost 40% of its value due to the repudiation of the loan. [Bass Appraisal, pgs. 71-80]. This technique is an accepted appraisal method, *see Rogers v. U.S*, 96 Fed Cl. 462 (Fed. Cl. 2011); however, *The Appraisal of Real Estate*, 13th ed. by the Appraisal Institute, which Bass considers to be an authoritative source on the subject of real estate appraising [Bass Depo. pgs. 82-83], illustrates that this method should not have been employed because of the lack of comparable sales of partially completed office projects.

According to this treatise, "[p]aired data analysis is based upon the premise that when two properties are equivalent in all respects but one, the value of a single difference can be measured to indicate the difference in price between the two properties." *The Appraisal of Real Estate,* Appraisal Institute, 13th Edition, p. 316.

The appraisal manual, however, goes on to provide the following cautionary statement concerning the applicability of this appraisal technique: "Although paired data analysis is a theoretically sound method, it may be impractical when only a narrow sampling of sufficiently similar properties is available. This is particularly true for commercial and industrial properties and properties that do not sell frequently in the market." A lack of data can make quantifying the adjustments attributable to all the variables a difficult process. An adjustment derived from a single pair of sales is not necessarily indicative, just as a single sale does not necessarily reflect market value." [*The Appraisal of Real Estate*, p. 317].

Here, the paired sales analysis has too many differences for an appraiser to reach any type of reliable conclusion. For example, although Bass correctly uses the October 31, 2008 as the date of value in this case, he nonetheless relies upon three sales that took place some fourteen to seventeen moths after the date of value (i.e. January, March, and April 2010) without any adjustments. Because these sales would not have been available to a potential purchaser after the

date of appointment of the receiver, they must be viewed with great caution. All three of Bass' sales are too remote in time to have any evidentiary value based upon the condemnation case of *United States of America v. 10.082 ACRES OF LAND*, 2007 WL 962846 (D. Ari., March 27, 2007).

In that condemnation case, the court excluded the property owner's sales which were more than five months away from the date of value in a changing market finding that the probative value of the comparable sales evidence proffered by owners' appraiser as to the market value of the condemned property on the valuation date was substantially outweighed by its prejudicial, confusing, and misleading effect. *Id* at *4. *See also Culbertson v. State Road Department*, 165 So.2d 255 (Fla. 1st DCA 1964) (appraisal made four months before the taking was too remote to be valid). Moreover, Bass violated his own criteria for selecting sales that are too remote in time because all three of his partially-completed projects that resold were well beyond six months after the date of value. [Bass Depo. pg. 47-48 and Bass Appraisal, pgs. 72-80]. From a practical standpoint, courts do not allow sales beyond six months of the date of valuation, whereas the sales here were more than double that time frame. *See* The Florida Bar, *Florida Eminent Domain Practice and Procedure,* § 9-71. 7th Ed. ("In practice, courts allow evidence of sales up to six months or so after the date of valuation.").

While the remoteness in time of the sales may not constitute a sufficient basis for excluding Bass' opinion by itself, other differences exists here which demonstrate the overall lack of comparability. All three of Bass' paired sales are incomparable to the Placida Property because they are not located in Charlotte County like the Placida Property; instead, his sales are located a substantial distance away in Hendry, Hillsborough and Collier counties—all of which have substantially different economic conditions than Charlotte County. [Bass Appraisal, Pgs.

72-80]. In *Rochelle v. State Road Department*, 196 So.2d 477 (Fla. 2d DCA 1967), the state appellate court held that the trial judge should not have excluded sales from different counties to appraise land at turnpike exits because their very nature meant that comparable properties would be geographically removed from one another. The *Rochelle* case, however, was construed in *Williams v. Jacksonville Electric Authority*, 250 So.2d 652 (Fla. 1st DCA 1971), to apply only to unique situations. *See* The Florida Bar, *Florida Eminent Domain Practice and Procedure*, 7th Ed. § 9-78. In *Williams*, the appellate court held that transmission lines built on easements were not so unique as to permit testimony concerning damages to the remainder of land from similar easements located between 100 and 200 miles away.

At his deposition, Bass attempts to explain his reasons for selecting the three out-of-county sales without making adjustments to them by stating that the sales were not used for direct comparison purposes. [Bass Depo. p. 59, line 4- p. 60, line 21]. That distinction, however, is one without a difference; Bass ultimately applies the percentage discount directly to the Placida Property. [Bass Appraisal, p. 80-81].

Beyond the dissimilarities in time and location, there also are substantial differences in size that would undermine the ability to isolate the discount for purchasing a partially-completed office project. Specifically, the Placida Property consists of 67,383 square feet, while one of the paired sales is almost double the size (130,838 s.f.) and another is less than half the size (29,808 s.f.). [Bass Appraisal, pgs. 72-78]. Also, comparable sale #3 was less complete when compared to the Placida Property which would overestimate the amount of damages. [Bass Appraisal, p. 78].

While real-estate appraisers have a fair amount of discretion in selecting comparable sales, their selection of sales is not unbridled, and the proposed evidence is still subject to legal

constraints in order to support a proper evidentiary foundation under Fed. R. Evid. 702. The case law regarding the admissibility of comparable sales is particularly instructive on this issue.

Comparable sales are the best evidence of market value. *99.66 Acres of Land,* 970 F.2d 651, 655 (9th Cir. 1992); *see Baetjer v. United States,* 143 F.2d 391, 397 (1st Cir.1944) ("What comparable land changes hands for on the market at about the time of taking is usually the best evidence of market value available. In the absence of such evidence a determination of value becomes at best only a guess by informed persons."). As the Supreme Court observed in *Kimball Laundry Co. v. United States*, 338 U.S. 1, 12 (U.S.1949): "If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference." *See also United States v. 84.4 Acres of Land*, 348 F.2d 117, 119 (3d Cir.1965) ("If sufficient similarities existed between the condemned tract and the properties sought to be used as comparable, ... the jury [must be allowed] to determine for itself whether the described properties were in fact comparable to the condemned tract, and if found comparable, what weight should be given thereto.").

"[C]omparability is a function of three variables: the respective characteristics of the properties, their geographic proximity to each other, and the closeness in time of the sales." *United States v. 68.94 Acres of Land*, 918 F.2d 389, 399 (3d Cir. 1990).

An appraiser's sales are not rendered admissible based upon the bare assertion that the sales are comparable. Substantial similarity of fact must exist to furnish an adequate basis for comparison. *U.S. v. 585.87 Acres of Land, More or Less, Osage County, Kan.* 210 F.Supp. 585 (D.C. Kan. 1962). The court's authority to exclude evidence of sales of dissimilar properties is affirmed with regularity. "The questions of whether [comparable sales] transactions are near

enough in time, or involve substantially similar lands, or significant amounts of land are all questions of the remoteness of the evidence offered and in consequence are for the trial court." *Baetjer*, 143 F.2d at 397.

**E. <u>The Failure of Mr. Bass to Make Any Adjustments to His Paired Sales Renders His Analysis Useless</u>**

Mr. Bass made absolutely no quantitative or qualitative adjustments to any of the three sales to account for any of the dissimilarities. [Bass Depo. p. 60, Line 25 –p. 61, lines 1-4, Bass Appraisal, pg. 80]. According to Bass, two out of his three "comparable" sales demonstrated a 40% percentage discount, while the remaining sale showed a percentage discount of 51%. [Bass Appraisal, p. 80]. In reviewing these sales, he concluded that a 40% discount should be applied to the Placida Property. [Bass Appraisal, p. 80].

The failure of Bass to adjust his sales based upon the substantial differences when compared to the Placida Property is contrary to accepted appraisal methodology and renders his conclusion of value misleading, unreliable, and thereby devoid of any evidentiary value. *See Nichols on Eminent Domain*. 4-12B Nichols § 12B.04 ((Since no two pieces of land are ever exactly alike, "parcels may only be compared where the dissimilarities are reduced to a minimum and allowance made for such dissimilarities.") (noting the "danger of diverting the minds of the jury from the real issue by their consideration of. . . collateral points, of the unnecessary waste of time by the introduction of such evidence in court, and a possibility of the jury being misled by testimony of the sale of land the resemblance of which to the land in issue is more specious than real.")). Mr. Bass attempts to justify the use of his unadjusted paired sales by the lack of available data. [Bass Depo, p. 53, lines 24-25, p. 54, lines 1-3]. The scarcity of data, however, has never been a license for an expert to render an opinion based upon insufficient evidence.

Mr. Bass' paired sales are inadmissible as a matter of law because they lack any evidentiary value to demonstrate that the discount rate attributable to the loss in funding can be extracted from the three sales he relied upon given the number of differences between the properties.

**F. Bass' Opinion Concerning the Loss in Value of the Land Due to the Loss in Funding is Unreliable and Defies Common Sense.**

According to Mr. Bass, the Placida Property had a land value of $810,000 as of October 31, 2008. [Bass Appraisal, p. 45]. Bass concludes that as a result of the repudiation of the loan, the Placida Property lost 68% of its overall value, resulting in after-repudiation value of $768,000. It defies common sense that not only the three office buildings comprising 17,600 square feet would lose all of their value, but that the land value would also somehow lose $42,000 in its value as a result of the repudiation of the Construction Loan Agreement.

While downward market conditions could account for a loss in value of the land, it cannot fairly be said that the repudiation of the Construction Loan Agreement impacted the value of the land for the Placida Property. Accordingly, Mr. Bass' opinion on this issue is not market driven; instead, his opinion is based upon speculative and misleading data that is unreliable and defies common sense. Accordingly, the Court as the gatekeeper of evidence should preclude Bass from testifying to his opinion.

**G. The Court's Role as Gatekeeper of Admissible Evidence.**

The district courts stand in the role of "gatekeeper" in screening evidence even after the Supreme Court's decision in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). *See also General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512 (1997). Rule 702 compels the district court to perform this critical "gatekeeping" function concerning the admissibility of expert scientific evidence." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)

(cert. denied, *Frazier v. U.S.*, 544 U.S. 1063, 125 S.Ct. 2516, 161 L.Ed.2d 1114 (2005)). As the Committee Notes to the 2000 Amendment to the Rule state, "this gatekeeper function applies to all expert testimony, not just testimony based in science."

Federal Rule of Evidence 702 provides in relevant part that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case."

All three requirements of the above rule were not met here. Bass opinions concerning the "as if" completed value of the Placida Property and the 28% damage calculation are based upon his misconception of the type of damages permitted by FIRREA. See *Mulkey v. Division of Administration, State of Florida Dept. of Transportation*, 448 So. 2d 1062 (Fla. 2d DCA 1984) (appraiser's opinion cannot be based upon misconception of law). In addition, Bass selected three paired sales that are not comparable to the Placida Property, and he failed to make any adjustments to his sales before concluding a 40% diminution in value of the Placida Property.

**CONCLUSION**

Based on the foregoing authorities, the Court should enter an order granting the FDIC as Receiver's Cross Motion for Partial Summary Judgment as to the amount of damages, and award costs and such other relief the Court deems justified.

Respectfully submitted,

/s/ Michael H. Rosen, Esq.
DAVID J. TONG, ESQ.
Florida Bar No. 437085
dtong@saxongilmore.com
MICHAEL H. ROSEN, ESQ.
Florida Bar No. 710393
mrosen@saxongilmore.com
**SAXON, GILMORE, CARRAWAY, & GIBBONS, P.A.**
201 East Kennedy Boulevard, Suite 600
Tampa, Florida 33602
Phone: (813) 314-4500
Fax: (813) 314-4555
Attorneys for Federal Deposit Insurance Corporation as Receiver for Freedom Bank

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 4, 2011, I presented Defendant, FDIC as Receiver's Cross Motion for Partial Summary Judgment and Incorporated Memorandum of Law in Support Thereof, to the Clerk of the United States District Court, Middle District of Florida, Tampa Division, for filing and uploading to the CM/ECF system, which will send a Notice of Electronic Filing to: Sheryl A. Edwards, The Edwards Law Firm, PL, 1901 Morrill Street, Sarasota, FL 34236.

/s/ Michael H. Rosen, Esq.