UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PLACIDA PROFESSIONAL CENTER,
LLC, a Florida Limited Liability Company,
MICHAEL B. EDWARDS and SHERYL A.
EDWARDS,

    Plaintiffs,
v.                                    CASE NO. 8:2009 CV 02221-T30 MAP

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Freedom Bank,

    Defendant.
_____/

## DEFENDANT FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FREEDOM BANK'S AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION IN LIMINE TO EXCLUDE APPRAISAL TESTIMONY OF RICHARD BASS, MAI, AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT THEREOF

Defendant, FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FREEDOM BANK ("FDIC as Receiver"), pursuant to Fed. R. Civ. P. 56 and Middle District of Florida Local Rule 3.01, hereby moves for partial summary judgment as to Count II of the First Amended Complaint [Docket No. 21] against Plaintiff, PLACIDA PROFESSIONAL CENTER, LLC, a Florida Limited Liability Company ("Placida"), or in the alternative, moves in limine to exclude the appraisal testimony of Richard Bass, MAI, on behalf of Placida because it is clearly inadmissible, and in support hereof, as more particularly described in the Incorporated Memorandum of Law, states as follows:

**I.    INTRODUCTION**

This case arises out of the FDIC as Receiver's disallowance of Placida's administrative

claim for repudiation damages pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). The FDIC as Receiver exercised its right under FIRREA to repudiate the continued funding of Placida's construction loan because the continued performance would be "burdensome," and repudiation would "promote the orderly administration of the failed institution's affairs." [Docket No. 21].

Placida's claim for repudiation damages is predicated upon the appraisal opinions of Richard Bass, MAI. [Docket Nos. 38, 40]. Because the material facts are not in dispute and Mr. Bass' appraisal opinion is based upon a misconception of federal law and is otherwise inadmissible as a matter of law, the FDIC as Receiver is entitled to partial summary judgment as to Count II of Placida's First Amended Complaint for repudiation damages.[1] Alternatively, the FDIC as Receiver is entitled to an Order in Limine precluding Mr. Bass from testifying at trial to repudiation damages in excess of the amount of money he opined is necessary to complete the Placida Project ($875,000), and any damages attributable to the proposed sale of the Placida mortgage.

## II. UNDISPUTED MATERIAL FACTS UPON WHICH PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED

1. Placida is a Florida Limited Liability Company whose principal place of business is located in Sarasota, Florida. [*See* Affidavit of Michael Edwards at ¶ 1].

2. Freedom Bank was a federally-insured banking institution whose principal place of business was located in Bradenton, Florida. On October 31, 2008, Freedom Bank was closed and the FDIC as Receiver was appointed as the receiver to wind up the affairs of Freedom Bank. [*See* Affidavit of Michael Edwards at ¶ 9].

---

[1] Plaintiffs Michael and Sheryl Edwards have also sued the FDIC as Receiver for repudiation damages, but given the fact they have acknowledged that they failed to file their administrative claims with the FDIC prior to the lawsuit, the FDIC as Receiver's pending motion to dismiss for lack of jurisdiction should be granted.

3. On or about February 28, 2007, Placida executed a Construction Loan Agreement, ("Construction Loan Agreement"), Promissory Note ("Note"), and Mortgage ("Mortgage"), as well as other documents (collectively referred to as "the Loan"), whereby Freedom Bank committed to lend the sum of $3,280,000 to Placida to construct a 17,600 square foot professional office center in Charlotte County, Florida ("the Placida Project"). The legal description of the Placida Project is as follows:

> Block 105, GROVE CITY SUBDIVISION, according to the plat thereof recorded in Plat Book 1, Page 4, of the Public Records of Charlotte County, Florida, together with vacated 15-foot alley described in Official Records Book 1844, Page 1557, and less state road right-of-way.

("the Placida Property"). [*See* Affidavit of Michael Edwards at ¶ 2 and Exhibit A thereto.]

4. Pursuant to the Construction Loan Agreement, Placida was to construct the Placida Project pursuant to a Construction Loan Budget submitted to and approved by Freedom Bank. [*See* Affidavit of Michael Edwards at ¶ 3].

5. Pursuant to the Construction Loan Agreement, $240,000 of the principal amount of the Loan was to be reserved for interest payments on the Loan during construction. [*See* Affidavit of Michael Edwards at ¶ 3].

6. On or about March 27, 2007, Placida and its general contractor, Fred Shute Real Estate and Development, Inc., executed a Construction Agreement for the construction of the improvements on the Placida Property. [*See* Affidavit of Michael Edwards at ¶ 4].

7. From July 27, 2007 to October 15, 2008, construction proceeded according to schedule with monthly draw requests submitted at the end of each month. A total of twelve draw requests were received, reviewed, and paid by Freedom Bank with disbursements made from the Loan in the total amount of $1,597,504.20 as of October 30, 2008. [*See* Affidavit of Michael Edwards at ¶ 5].

8. During construction, interest-only payments were made on the 28th day of each month by Freedom Bank drawing the same from the Interest Reserve. As such, the monthly interest payment due on October 28, 2008 was paid from the Interest Reserve on or about October 30, 2008. [*See* Affidavit of Michael Edwards at ¶ 6].

9. After payment of the October 30, 2008 interest payment, the next monthly interest payment was not due until November 28, 2008. [*See* Affidavit of Michael Edwards at ¶ 7].

10. After payment of the October 30, 2008 interest payment, the sum of $1,682,495.68 remained in the Construction account. [*See* Affidavit of Michael Edwards at ¶ 8].

11. The FDIC as Receiver was appointed as receiver for Freedom Bank on Friday, October 31, 2008. On that date, the Placida Project was approximately 3-4 weeks from completion of construction. [*See* Affidavit of Michael Edwards at ¶ 9].

12. On or about November 6, 2008, the FDIC as Receiver notified Placida that it was exercising its right of repudiation of the Loan pursuant to 12 U.S.C. § 1821(e), citing that the continued performance thereof by the FDIC as Receiver would be "burdensome" and repudiation would "promote the orderly administration of the failed institution's affairs." [*See* Affidavit of Michael Edwards at ¶ 10].

13. On or about February 3, 2009, Placida submitted a timely claim to the FDIC as Receiver for damages caused by the FDIC as Receiver's repudiation of the Construction Loan Agreement. The FDIC as Receiver received Placida's claim on February 4, 2009. [*See* Affidavit of Michael Edwards at ¶ 15 and Exhibit "C" attached thereto].

14. On or about July 30, 2009, the FDIC as Receiver sent Placida notice of its intent to extend the 180-day claims period, pursuant to 12 U.S.C. 1821(d)(5)(A)(ii), which was agreed to by Placida on August 3, 2009. [*See* Affidavit of Michael Edwards at ¶ 17 and Exhibit D thereto].

15. On or about September 1, 2009, and again on September 18, 2009, the FDIC as Receiver

notified Placida that it denied Placida's claim. [*See* Affidavit of Michael Edwards at ¶ 18].

16.  Placida engaged Richard W. Bass, MAI, a Sarasota-based real estate appraiser, who completed a retrospective appraisal report regarding the Placida Project. Bass' appraisal report sets forth his opinions of value in connection with the FDIC as Receiver's repudiation of the Placida Construction Loan Agreement. [*See* Docket No. 40, Notice of Filing Deposition Transcript of Richard Bass, MAI, with his appraisal report attached thereto].

17.  In his appraisal report, Mr. Bass opines that the Placida Project was 70% complete as of October 31, 2008, the date the FDIC as Receiver was appointed as receiver for the former Freedom Bank. [*See* Bass Appraisal, pgs. 9, 68].

18.  Mr. Bass concluded that the total damages due to Placida as of October 31, 2008 were $1,632,000, even though he found that the hard and soft costs to complete the Placida Project were $875,000. [*See* Bass Appraisal, pgs. 68-69].

19.  While Mr. Bass concluded that the hard and soft costs to complete the Placida Project were $875,000, he increased this amount to $1 million dollars to include "Leased-Up Period and Expenses", which include leasing commissions and other costs to achieve stabilized occupancy. [*See* Bass Appraisal, pgs. 68-69].

20.  Mr. Bass' damage calculation of $1,632,000 for the Placida Project is based upon a 68% loss in value, of which 28% is attributable to the purchase of the underlying Mortgage. [*See* Bass Appraisal p. 80].

21.  Chad Durrance, MAI, completed an appraisal report on behalf of the FDIC as Receiver and concluded that the diminution in market value of the Placida Project as of October 31, 2008 was $440.000. [See page 157, Deposition of Chad Durrance, MAI].

### III. ARGUMENT AND MEMORANDUM OF LAW

#### A. Summary Judgment Standard

Summary judgment is appropriate when the movant can demonstrate that the pleadings, depositions, affidavits, and other evidence available to the court establish no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265, (1986). Once the movant has met its burden, the nonmovant must demonstrate that there are fact issues warranting a trial. Fed. R. Civ. P. 56(e). In opposing summary judgment, the nonmoving party may not rely on conclusory allegations in his pleadings; rather, he must set forth sufficient evidence supporting a claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

If the nonmovant fails to make a showing on an element for which he bears the burden of proof, the movant is entitled to judgment as a matter of law. *See Celotex Corp.*, 447 U.S. at 323. The evidence must be viewed in a light most favorable to the nonmovant, *Id*, and the focus of this Court is upon disputes over material facts which might affect the outcome of the lawsuit.. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. , 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.1987), *cert. denied*, 484 U.S.851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987), and the cases cited therein.

In *Anderson*, the Supreme Court stated the trial court must consider the substantive burden of proof imposed on the party making the claim. 447 U.S. at 253. *Anderson* requires this Court to substantively evaluate the evidence offered by the moving and non-moving party to determine whether the evidence raises a "material" fact question

that is "genuine." The Court in *Anderson* defined "material" as involving a "dispute[] over facts that might affect the outcome of the suit under the governing law...." 447 U.S. at 248.

If the evidence advanced by the nonmoving party "is merely colorable... or is not significantly probative... summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 447 U.S. at 252).

### B. <u>Motion In Limine Standard</u>

The term "in limine" has been defined as "on the threshold; at the very beginning; preliminarily." *Luce v. U.S.*, 469 U.S. 38, 40, 105 S.Ct. 460, 462, 83 L.Ed.2d 443 (1984) (citing Black's Law Dictionary 708 (5th ed.1979)). A motion in limine seeks a protective order prohibiting the opposing party, counsel, and witnesses from offering offending evidence at trial, or even mentioning it at trial, without first having its admissibility determined outside the presence of the jury. 75 Am.Jur.2d Trial § 39 (2008). A motion in limine may be proper where the evidence at issue is highly prejudicial or inflammatory; where the evidentiary issue is significant and unresolved under existing law; where the issue involves a significant number of witnesses or volume of material, making it more economical to have it resolved prior to trial; or where the movant does not wish to object in the presence of the jury. Id.

If evidence is clearly inadmissible, the Court will grant the motion in limine; however, if it is not, the Court will review the issue at trial. *Stewart v. Hooters of America, Inc.*, 2007 WL 1752843 at*1(M.D.Fla.2007). Denial of a motion in limine does not ensure that the evidence contemplated by the motion will be admitted at trial. Instead, denial of the motion means the

court cannot determine whether the evidence in question should be excluded outside the trial context. *U.S. v. Connelly*, 874 F.2d 412, 420 (7th Cir.1989). A district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling, even if nothing unexpected happens at trial. *Luce*, 469 U.S. at 41, 105 S.Ct. at 463.

### C. **FIRREA Limits Repudiation Damages to Actual-Direct-Compensatory Damages.**

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101-73, 103 Stat. 183, 187, permits the receiver of a failed financial institution to repudiate any lease or contract that the receiver finds to be burdensome. *See* 12 U.S.C. §1821(e)(1). In pertinent part, FIRREA provides as follows:

> In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
>
> (A) to which such institution is a party;
>
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

*Id.* Repudiation pursuant to the statute is treated as a breach of contract giving rise to an ordinary contract claim for damages. *See Howell v. FDIC*, 986 F.2d 569, 571 (1st Cir.1993). The following provisions of FIRREA, however, expressly limit the damages that may be assessed by courts for the FDIC's repudiation of a contract:

> Except as otherwise provided in subparagraph (C) and paragraphs (4), (5), and (6), the

liability of the conservator or receiver for the disaffirmance or repudiation of any contract pursuant to paragraph (1) shall be-

> (i) limited to actual direct compensatory damages; and
>
> (ii) determined as of-
>
>> (I) the date of the appointment of the conservator or receiver; or
>>
>> (II) in the case of any contract or agreement referred to in paragraph (8), the date of the disaffirmance or repudiation of such contract or agreement.

12 U.S.C. § 1821(e)(3)(A).

FIRREA limits the damages that can be recoverable as a result of a repudiated contract to "actual direct compensatory damages," determined as of the date of the appointment of the conservator or receiver. *Id.* Although the statute does not define the term "actual direct compensatory damages," it does expressly exempt recovery of: 1) punitive or exemplary damages; 2) damages for lost profits or opportunity; and 3) damages for pain and suffering. 12 U.S.C. § 1821(e)(3)(B).

Courts have consistently interpreted these provisions against the background of Congress' evident purpose, which was " 'to spread the pain,' in a situation where the assets are unlikely to cover all claims," and thus maximize the number of creditors who can recover some portion of what they are owed. *DPJ Co., Ltd. v. FDIC*, 30 F.3d 247, 248 (1st Cir. 1994); *see also Nashville Lodging Co., v. RTC*, 59 F.3d 236, 241 (D.C. Cir. 1995). It is also likely that Congress was concerned that the government's liability to the insured depositors of a failed bank would be increased if the bank's assets were depleted to pay off contract-claim creditors, thus providing a another reason to pare back damages claims founded on repudiated contracts. *Howell v. FDIC*, 986 F.2d 569, 570 (1st Cir. 1993). In keeping with that legislative intent, courts have limited

recovery on such claims to actual out-of-pocket losses. *See e.g. Howell,* 986 F.2d 569 (1st Cir.1993) (holding that bank officers could not recover severance pay under repudiated agreement); *FDIC v. Cobblestone,* 1992 WL 333961 (D.Mass. 1992) (no recovery for diminution in going-concern value of company as a result of loss of a line of credit repudiated by receiver).

"'[A]ctual direct compensatory damages' appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation." *McMillian v. F.D.I.C.,* 81 F.3d 1041, 1055 (11th Cir. 1996).

### D. The FDIC as Receiver is Entitled to Partial Summary Judgment Because Placida's Claim for Repudiation Damages Contravenes FIRREA's Actual Direct Compensatory Damages Limitation.

The Court should enter partial summary judgment as to Count II of the Amended Complaint in favor of the FDIC as Receiver because the material facts are not in dispute and Placida is attempting to claim repudiation damages in excess of those permitted by FIRREA. It is undisputed that the amount sought by Placida for the repudiation of its Construction Loan Agreement hinges entirely on the appraisal opinion of Mr. Bass. Mr. Bass' opinion, however, violates FIREEA's "actual direct compensatory damages" limitation. Specifically, Mr. Bass misinterprets FIRREA's "actual direct compensatory damages" limitation to permit damages in excess of the cost to complete the Placida Project.

In his appraisal report, Mr. Bass opined that Placida is entitled to damages of $1,632,000 even though he opined that the hard and soft cost to complete the Placida Project is $875,000. [*See* Bass Appraisal Report, p. 86]. Mr. Bass adds on an additional $125,000 which represents potential leasing commissions and other expenses to achieve stabilized occupancy to his cost to complete the Placida Project. [*See* Bass Appraisal 86-87.] These costs are costs that Placida

would spend in any event and are not affected by the repudiation. Therefore, because there is no record evidence that these costs have been incurred or would be incurred, the cost to complete the Placida Project is properly capped at $875,000.

Congress enacted 1821(e)(3) as a means of paring back the amount of damages that are recoverable for repudiation claims in order to cover insured deposits. See *Howell v. FDIC*, 986 F.2d at 570. In enacting the actual direct compensatory damages limitation in §1821(e)(3), Congress distinguished between "damages which can be thought to make one whole " and damages "that are designed to . . . put a plaintiff securely in a financial position he or she would have occupied but for the breach." *Monrad v. FDIC*, 62 F.3d at 1169, 1174 (9th Cir. 1995). To allow Placida to seek damages in excess of the remaining cost to complete the Placida Project would not only eviscerate FIRREA's limitation on the amount of recoverable damages, but would also result in a windfall to Placida at the FDIC as Receiver's expense.

The FDIC as Receiver's position is supported by the Eleventh Circuit in the case of *McMillian v. FDIC*, supra. In *McMillian*, the Court defined the parameters of "actual direct compensatory damages" under FIRREA. In doing so, it relied upon *Black's Law Dictionary* (6th Ed, 1991), for the definition of the term "compensatory damages" as "those damages that will compensate injured party for injury sustained, and nothing more; compensatory damages are such as will simply make good or replace loss caused by wrong or injury." *McMillian at 1055*.

The Court also looked to *Blacks Law Dictionary* to define the term actual damages. "Actual damages," roughly synonymous with compensatory damages, are defined as "[r]eal, substantial and just damages, or the amount awarded to a complainant in compensation for his actual and real loss or injury, as opposed ... to 'nominal' damages [and] 'punitive' damages." *Id.* Finally, "[d]irect damages are such as follow immediately upon the act done." *Id.* Thus, "actual

direct compensatory damages" appear to include those damages, flowing directly from the repudiation, which make one whole, as opposed to those which go farther by including future contingencies such as lost profits and opportunities or damages based on speculation.

The funds necessary to complete the Placida Project represent a ceiling on the amount of repudiation damages that can be recovered in this case. Mr. Bass, however, fails to take into account FIRREA's fundamental limitation and as a result, completed his appraisal report on a faulty premise. If the Court were to permit damages beyond the cost to complete the Placida Project, the Court would be compensating Placida for damages that were not a direct result of the repudiation and which are speculative.

### E. Placida's Claim for Damages Associated with the Purchase of the Underlying Mortgage are not Recoverable Under FIRREA.

In addition to seeking a 40% loss in value of the Placida Project due to the repudiation of the Construction Loan Agreement, Placida also claiming an additional 28% of loss in value associated with the "purchase of the underlying mortgage." [Bass Appraisal, p. 80]. This claim is based entirely upon an appraisal opinion of Mr. Bass which is improper as a matter of law under FIRREA's actual direct compensatory damage limitation. Mr. Bass' answers to the following questions during his deposition illustrate that his opinion regarding this additional 28% in damages is not attributable to the loss of funding of the loan, but is instead related to the purchase of the Mortgage.

> Q. And then in addition to that, you concluded to a 40 percent diminution in value based on those three comparable sales?
>
> A. Yes.
>
> Q. And then on top of that, you determined that another 28 percent was appropriate, correct?
>
> A. Yes.

> Q. Can you explain to me the basis for that opinion?
>
> A. Yep. I think I wrote it out here for you.
>
> As we looked at those particular three that we just discussed, we were able to identify a document that discount was applied. What we were not able to verify and document specifically for each of those is what that mortgage sold for.
>
> So bank A sells the mortgage on -- let's just pick a property -- for 20 cents on the dollar. We can't verify that. That is not public domain information. We have a range of what that discount is.
>
> That is Mission Capital, for example. It says if those discounts we form off those mortgages, you know, we are getting from 20 to 60 percent discount and sometimes even higher. So while we've got confirmation of the subsequent sale of the property and what that discount was, we don't have the original discount from the bank to the wholesaler who is buying that mortgage. And that guy is turning around and selling it. This is the sale we have. We don't have this discount. But we know that range is 20 to 60 percent or higher. We have confirmed that information. So what do I apply out of that range? I can apply 20 percent or I can apply 60 percent. Well, if I apply 60 percent, plus the 40 percent discount, that is 100 percent. That is not logical. You can't do that. So it has got to be something else. Then you sit back and go, all right, within this project what is reasonable, what is logical in order to apply an appropriate discount. I got the support for 20/60. Where am I going to pick in that number? You want to pick in that number with what is consistent with what the ultimate analysis we've done here. That works out to about 28 percent. [Bass Depo. pgs. 77-79].

Mr. Bass' opinion on this issue is misleading because he attempts to mix the damages he believes are attributable to the loss in value of the real estate with the proposed sale of the underlying Mortgage. Simply put, the issue of what a bank could get for selling off a nonperforming loan is a proverbial red herring that has nothing to do with the amount of Placida's recovery in this case.

Even if this damage was somehow recoverable, Mr. Bass' explanation clearly demonstrates that there is no market evidence for his opinion and his 28% figure is nothing more

than a number that he picked out of thin air. Damages however must be proved with "reasonable certainty," and cannot be speculative. *Nebula Glass Int'l, Inc. v. Reichhold, Inc.* 454 F.3d 1203, 1213 (11th Cir. 2006); *Environmental Biotech, Inc. v. Sibbitt Enterprises, Inc.*, 2008 WL 5070251, *5 (M.D. Fla. Nov. 24, 2008) (expert applied unreliable methodology). Moreover, Rule 703 of the Federal Rules of Evidence was intended to broaden the acceptable bases of expert opinion, but was not intended to make summary judgment impossible whenever a party has produced an expert to support its position, and does not preclude summary judgment against a party who relies solely on an expert's opinion that has no basis other than theoretical speculations. *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, (C.A.D.C.1977).

## MOTION IN LIMINE

The FDIC as Receiver has moved in limine to exclude the challenged testimony in the event the Court finds an Order in Limine the more appropriate vehicle for excluding the challenged testimony of Mr. Bass. A motion in limine is an accepted vehicle for limiting or excluded legally insufficient expert testimony. In Re Commercial Money Center Inc., 2007 WL 1514282 at *3 (N.D. Ohio May 22, 2007); *Johnson v. Manitowoc Boom Trucks*, 406 F. Supp. 2d 852, 864 n. 10 (M.D. Tenn. 2005). Accordingly, in the alternative, the FDIC as Receiver requests that Mr. Bass be excluded from providing any testimony that (1) Placida's damages exceeded $875,000 and (2) that Placida is entitled to 28% in damages related to the proposed sale of the underlying Mortgage.

## CONCLUSION

Based on the foregoing authorities, the Court should enter partial summary judgment on damages as to Count II of the Amended Complaint because there are no material issues of disputed fact and the FDIC as Receiver is entitled to a judgment as a matter of law.

Alternatively, the Court should enter an Order in Limine precluding Mr. Bass from testifying at trial to damages that exceed the $875,000 he determined to be the cost of completing the Placida Project, and from testifying to any damages associated with the purchase of the Placida Mortgage.

Mr. Bass' appraisal opinion is based upon a misconception of federal law because he concludes that Placida is entitled to repudiation damages of $1,692,000 even though he opines that the cost of completing the Placida Project is only $875.000. In addition, Mr. Bass' opinion as it relates to 28% in additional damages allegedly incurred as a result of the purchase of the underlying Mortgage is impermissible, since such damages are prohibited by the actual-direct-compensatory-damage limitation contained in 12 U.S.C. § 1821(e)(3)(A) of FIRREA. The FDIC as Receiver also requests the award of such other relief the Court deems justified.

Respectfully submitted,

/s/ Michael H. Rosen, Esq.
MICHAEL H. ROSEN, ESQ.
Florida Bar No. 710393
mrosen@saxongilmore.com
**SAXON, GILMORE, CARRAWAY, & GIBBONS, P.A.**
201 East Kennedy Boulevard, Suite 600
Tampa, Florida 33602
Phone: (813) 314-4500
Fax: (813) 314-4555
Attorneys for Federal Deposit Insurance
Corporation as Receiver for Freedom Bank

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 20, 2011, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record who are CM/ECF participants.

/s/ Michael H. Rosen, Esq.